**TODHUNTER–MITCHELL & CO., LTD.**

v.

**ANHEUSER–BUSCH, INC.**

**Civ. A. No. 70–676.**

United States District Court,
E. D. Pennsylvania.

Feb. 27, 1974.

Henry Kolowrat, Philadelphia Pa., for plaintiff.

Benjamin M. Quigg, Jr., Philadelphia, Pa., for defendant.

## OPINION

BECHTLE, District Judge. .

*Introduction*

This is a private antitrust action brought under Sections 4 and 16 of the Clayton Act, 15 U.S.C. §§ 15 and 26, in which continuing violations of Sections 1 and 2 of the Sherman Act, 15 U.S.C. §§ 1 and 2, are alleged. Plaintiff seeks injunctive relief and treble damages.

Plaintiff, Todhunter-Mitchell & Co., Ltd. ("Todhunter-Mitchell"), a wholesale distributor of liquor and beer in the Bahama Islands, contends that defendant, Anheuser-Busch, Inc. ("Anheuser-Busch"), has unlawfully restrained its wholesale distributors in the Houston and Atlanta regions from reselling Budweiser beer outside of their respective designated territories. Specifically, Todhunter-Mitchell asserts that the defendant combined and conspired with its Miami and New Orleans distributors to enhance and preserve the economic position of Bahama Blenders, Ltd. ("Bahama Blenders"), the Anheuser-Busch distributor in the Bahamas, by restraining those other distributors from selling and exporting Budweiser beer to

the plaintiff, a competitor of Bahama Blenders. The plaintiff has been unsuccessful in repeated attempts to purchase Budweiser beer from wholesalers located in Miami and New Orleans for import into the Bahamas for retail sale there. Anheuser-Busch asserts that its refusal to deal with the plaintiff (such refusal manifested through the failure or refusal of the Anheuser-Busch distributors in Miami and New Orleans to sell wholesale quantities of Budweiser beer to Todhunter-Mitchell) represents action taken unilaterally by defendant and motivated by legitimate marketing considerations relating to quality control and potential over-supply of the product and not for any anti-competitive motive pursuant to any unlawful agreement or understanding with the distributors involved herein. The issue presented for this Court's determination is whether the restrictions imposed on the distributors by Anheuser-Busch constituted an unreasonable restraint of trade in violation of Section 1 of the Sherman Act. This Opinion contains the findings of fact and conclusions of law which constitute the grounds for this Court's decision with respect to the present proceedings.

*Findings of Fact*

1. Plaintiff, Todhunter-Mitchell, is a Bahamian corporation with its principal place of business in Freeport, Grand Bahama Island. It is engaged in the production, bottling, and sale of gin, vodka, and various cordials; the blending, bottling, and sale of rum, bourbon, and whiskeys; and the sale of beer. Todhunter-Mitchell imports beer into the Bahamas from the United States and Europe and resells such beer solely on Grand Bahama Island. A. Kenneth Pincourt, Jr., is the president of Todhunter-Mitchell. Until his death in 1971, Arthur K. Pincourt, Sr., was the secretary-treasurer of Todhunter-Mitchell. At all times relevant to this litigation, plaintiff had a subsidiary, Dave Streiffer Company ("Streiffer"), a ship's chandler in New Orleans, Louisiana.

Joseph M. Lichtenstein, Jr., is the president of Streiffer.

2. Defendant, Anheuser-Busch, is a Missouri corporation with its principal place of business in St. Louis. It is the country's biggest brewer of beer, with 1971 sales of over 24 million barrels (produced in 8 breweries located at St. Louis, Missouri; Houston, Texas; Los Angeles, California; Newark, New Jersey; Columbus, Ohio; Jacksonville, Florida; Tampa, Florida, and Merrimack, New Hampshire) and distributed principally through about 950 wholesalers. Its beer division had sales of $832,183,000 in 1971, representing approximately 19% of the brewing industry sales volume. Anheuser-Busch's brands are Michelob, Budweiser, and Busch-Bavarian. The Anheuser-Busch distribution points principally involved in this litigation are:

(a) *National Brands, Inc. ("National Brands")*—This is a Florida corporation with its principal place of business in Miami. It is the duly-appointed Anheuser-Busch wholesaler in the Miami area and elsewhere in southern Florida. Jerome Blank is the president, and Marvin S. Florman is its general manager. National Brands has continued to be the Anheuser-Busch wholesale distributor for the southern Florida area until the present time.

(a) *A&B Distributors, Inc. ("A&B")*—A&B was a Louisiana corporation with its principal place of business in New Orleans. Until May, 1969, this operation, then independently owned, was the Anheuser-Busch wholesaler in the New Orleans area. In May, 1969, Anheuser-Busch acquired certain of the assets of the A&B and, since that time, the New Orleans wholesale operation has continued as a branch of Anheuser-Busch. Alan T. Sparkman was the branch manager of A&B and is now manager of this Anheuser-Busch New Orleans branch.

(c) *Bahama Blenders, Ltd. ("Bahama Blenders")*—This is a Bahamian corporation with its principal place of busi-

ness in Nassau. It is the duly-appointed Anheuser-Busch wholesaler in the Bahamas. At all times relevant to this litigation, Jaffrey Stewart has managed and controlled this distributorship. Bahama Blenders and Todhunter-Mitchell are active competitors in the extensive and lucrative market for alcoholic beverages on Grand Bahama Island.

3. Anheuser-Busch has a field organization for marketing its beer which is divided into geographical and authority-level areas of responsibility. The country is divided into divisions, each of which, in turn, is divided into districts. The Anheuser-Busch personnel primarily concerned in 1969 with the matters in this action were as follows:

(a) Sales to National Brands and to Bahama Blenders were the immediate responsibility of the Miami district, headed by District Manager Robert M. Martin. Martin reported to Division Manager James R. Nesbitt in Tampa, who in turn reported to Southeastern Regional Manager Robert F. Stockhausen in Atlanta.

(b) Sparkman, as manager of the Anheuser-Busch New Orleans branch, reported to the Division Manager in Little Rock, Arkansas, who in turn reported to the Regional Manager in Houston, Texas. Joe A. Loyd was Assistant to the Regional Manager in Houston.

(c) The Regional Managers for Atlanta and Houston, and other Regional Managers, reported to Charles S. Aulbert, vice-president (Operations), who was in headquarters in St. Louis, Missouri.

4. Beginning in late 1968, Todhunter-Mitchell went into the business of importing American and European beers into the Bahamas. It made arrangements to buy Pabst, Schaeffer, and Carling beer from a Florida wholesaler beginning in January of 1969. Although Todhunter-Mitchell did purchase and import a variety of American beers, it was unable to buy Budweiser. Ship chandlers and other wholesalers in the United States were approached by Todhun-ter-Mitchell, but it could not obtain Budweiser from them.

5. During the early part of February, 1969, Arthur Pincourt, Sr., had a series of conversations with Messrs. Blank and Florman of National Brands. Pincourt wanted to buy 10,000 cases of Budweiser from National Brands. Mr. Florman relished the idea of selling such a large quantity of beer and obtaining a customer the size of Todhunter-Mitchell, but explained to Pincourt that it would first be necessary to contact Mr. Busch, a top executive in the Anheuser-Busch home office, in order to receive permission for such a sale. Florman told Pincourt that he would contact the Anheuser-Busch home office in order to determine if the sale to Todhunter-Mitchell in the Bahama Islands was acceptable policy. Two or three weeks later, Florman reported back to Pincourt and informed him that Mr. Busch had vetoed the sale of Budweiser beer to Todhunter-Mitchell in no uncertain terms.

6. In late February of 1969, Todhunter-Mitchell made another effort to purchase Budweiser from National Brands. A. Kenneth Pincourt, Jr., the president of Todhunter-Mitchell, called Marvin Florman of National Brands and informed him of Todhunter-Mitchell's renewed interest in purchasing large quantities of Budweiser for the Bahama distributorship. Florman expressed a willingness to sell Budweiser to Todhunter-Mitchell but again indicated in the conversation that it was necessary to obtain the approval of Anheuser-Busch before the sale of the beer could be consummated.

7. Todhunter-Mitchell did not place a formal written order with National Brands for a certain quantity of beer. The offer to purchase consisted solely of oral solicitations that Todhunter-Mitchell wanted to buy substantial quantities of Budweiser beer from National Brands.

8. In late summer of 1969, Anheuser-Busch diverted to New Orleans a load of Busch-Bavarian beer destined for a Biloxi, Mississippi, wholesaler.

This was done because a devastating hurricane wiped out the Mississippi accounts that would have bought the beer. The New Orleans branch manager (Sparkman) was asked by Anheuser-Busch representative Joe Loyd to see if he could sell it.

9. Sparkman contacted Joseph M. Lichtenstein, Jr., the president of Streiffer, and asked him whether he would buy some 1,900 cases of Busch-Bavarian at a price of $1.95 per case. Lichtenstein contacted Pincourt and he agreed to buy the Busch-Bavarian but only if Sparkman would sell Budweiser also. Lichtenstein called Sparkman back and told him that he would take the Busch-Bavarian but that he wanted Budweiser also; Sparkman agreed. Lichtenstein then ordered 975 cases of Busch-Bavarian and 975 cases of Budweiser. The order was eventually changed to include 675 cases of Busch-Bavarian and 1,275 cases of Budweiser. The beer was shipped to the Bahamas on September 14 and October 20, 1969.

10. Jaffrey Stewart of Bahama Blenders noticed shipments of Budweiser and Busch-Bavarian from sources other than his own during September, 1969. He promptly complained by telephone to Anheuser-Busch District Manager Martin and asked if he could do anything about it. Stewart also complained in person to Division Manager Nesbitt, who happened to be in Freeport on a market visit.

11. At Nesbitt's instructions, Martin went to Freeport to determine the source of the Budweiser beer being sold in the Bahamas by distributors not authorized by Anheuser-Busch. Martin testified that he was concerned, stating that, "I had never experienced anything like this before, where some other wholesaler brought in our product." Martin visited various customers of Todhunter-Mitchell and searched their trash to examine discarded cases of beer. He also bought some cans of Budweiser from the same customers. Martin sent the empties and the end flaps from the cartons to Nesbitt, since they have a code showing the date of manufacture and the particular brewery from which they were shipped.

12. During Martin's personal visit to Freeport, Stewart told him that Bahama Blenders was extremely unhappy that Anheuser-Busch products were coming into the Bahama market without the knowledge of Bahama Blenders. Stewart asked Martin if there was any way of stopping the flow of the beer. Martin expressed his desire to cooperate with the wholesaler and told him to address his complaint in writing to Division Manager Nesbitt in Tampa, Florida.

13. Nesbitt made a telephone report to his superior, Regional Manager Stockhausen, in Atlanta and then sent Stockhausen a written report dated September 30, 1969, summarizing Martin's investigation. The following are pertinent excerpts from that report:

"As reported to you in a telephone conversation last week, some Budweiser and Busch 12 oz. cans have found their way to Freeport. After a personal investigation by Division Manager Bob Martin, the following are his findings.

.    .    .    .    .    .

"The company which is attempting to sell this beer is Tod-Hunter (sic). This company bottles Scotch, whisky, gin, rum, etc. They buy from time to time some Carling and Regal beer; however, they are not considered bona fide beer distributors. They have expressed an interest in Anheuser-Busch and other brands as well. Also, they do not belong to the local Association in Freeport.

"The company is an over-the counter (sic) stock company, and the principal stockholders reportedly live in the West Palm Beach area. Mr. Martin reports that some of the owners are very close friends of Mr. Marvin Florman of National Brands.

"The Tod-Hunter (sic) Company is selling the Budweiser and the Busch at the same price, which is $7.75 [per

case]. This is 50¢ under the Bahamas Blenders price on Budweiser.

.    .    .    .    .    .

"Mr. Martin forwarded to this office one of each of the cans and end flaps from the master cartons, showing the codes. This material is being held in this office for further disposition awaiting your recommendations."

14. By letter dated October 17, 1969, Stewart made a written complaint to Nesbitt, the relevant parts of which are as follows:

"As you are aware, we are having tremendous problems of late due to the fact that one of our competitors, Todhunter-Mitchell & Co., Ltd., have been bringing in Budweiser and Busch illegally into Grand Bahama and offering it at prices below those set by the Bahamas Liquor Association.

.    .    .    .    .    .

"I have been trying to think who might have supplied the product to Todhunter, other than American Distributors, and two names come to my mind, one being a ship's chandler company in New Orleans called Dave Streiffer, this being a fully-owned subsidiary of Todhunter-Mitchell; also Florida Export Tobacco Company, ship's chandlers in Miami.

"I do not know what you can do to help us in this matter but I do request most sincerely that you investigate with all urgency as we are in an invidious position having a bootlegger in the area supplying our customers with product at prices below those set by your wholesaler. Moreover, we are considerably upset to find him with stocks of Busch when I have been trying to get prices and delivery of this product from you for the last 2 years."

15. Nesbitt forwarded Stewart's letter to Stockhausen on October 20, 1969. In his letter of transmittal, Nesbitt noted that, "The additional information included in Mr. Stewart's letter should enable us to pursue this matter more proficiently." He also promised to send Stockhausen Todhunter's price list, mentioning that Todhunter's list indicates that "several major brands including Schlitz, Pabst, Carling, Regal, etc. are available at reduced prices." [1]

16. By letter dated October 23, 1969, Stockhausen forwarded all of the previous correspondence to his superior, Vice President/Marketing (Beer) Aulbert in St. Louis, stating:

"Please refer to the attached correspondence, in particular the letter written by Mr. J. Stewart of Bahamas Blenders, Ltd., Nassau, providing us with information and details regarding shipments of our brands of beer which are being made to the Bahamas illegally. There are now estimated to be some 4000 cases of Budweiser and Busch combined which are being sold at a price lower than those established by our legitimate wholesaler in these islands.

"We have pursued every lead possible in attempting to identify the source of this product, particularly from within the state of Florida or the Port of Miami-West Palm Beach. Nothing has been discovered. At this point, we are suggesting that the beer is probably coming through the Port of New Orleans.

"We look upon this as a very serious matter and will appreciate any help you can provide in attempting to curtail the availability and shipment to the Bahamas."

17. On October 27, 1969, Aulbert wrote to Messrs. Rideout and Parker, Regional Managers in Houston and Newark, respectively, sending copies to Stockhausen and to each of the three brand managers in St. Louis. Aulbert stated:

"Attached is a memorandum from Bob Stockhausen covering a serious probbem that he has in the Bahamas.

---

1. Nesbitt's observation about Schlitz was incorrect. Schlitz is not in fact a brand handled by Todhunter-Mitchell and is not on their list.

"We would appreciate very much each of you gentlemen checking into this situation to find out if, by any chance, the source of this problem could be coming from somewhere in your respective areas of responsibility.

"After you have thoroughly investigated this situation, please advise us accordingly with a carbon copy to Mr. Stockhausen."

18. Considerable efforts were made by Anheuser-Busch employees to trace the shipments of Budweiser beer to Todhunter-Mitchell. Loyd, the Assistant to Houston Regional Manager Ed Rideout, called Sparkman and requested that he check his files to see if he had anything to do with the shipment of approximately 3,500 cases of Busch-Bavarian and Budweiser to the Bahamas. An examination of the invoices of the New Orleans branch distributor revealed that Sparkman had, in fact, sold the beer that was ultimately shipped to Todhunter-Mitchell in the Bahamas. Loyd was subsequently informed of Sparkman's implication in the sale of the beer to Todhunter-Mitchell in the Bahamas.

19. Loyd subsequently recontacted Sparkman and instructed him that he should not sell beer for distribution into the Bahamas. The reason given by Loyd was that Anheuser-Busch was in short supply of beer. Sparkman responded, "Okay, I won't do it." Since the time Sparkman received such instructions from Loyd, A & B has not sold Anheuser-Busch beer to the Streiffer ship's chandler for shipment to the Bahamas.

20. Anheuser-Busch plants were shut down because of a labor dispute from May 27 to June 29, 1969, and no beer was produced or shipped from its plant during that period. It is estimated that the loss from this shutdown was approximately two million barrels of beer from total sales in 1969 of approximately 18,712,000 barrels. The effects of the strike lasted until December of 1969; a shortage of supply of Anheuser-Busch products was felt throughout the distribution system until that time.

21. About the first part of November, Sparkman called Lichtenstein and told him that, on instructions from St. Louis, he could not sell Streiffer any more beer for shipment to the Bahamas. The refusal persists to this day. Sparkman did mention that Streiffer could order beer for its ship's chandler trade.

22. After the beer had been traced to Streiffer, Stewart requested of the people at Anheuser-Busch that such an incident not occur again. Anheuser-Busch explained to Stewart that the distribution of beer from the various wholesalers was very difficult to control and gave no guarantee that it would not happen again. Anheuser-Busch did indicate that an effort would be made to prevent further unauthorized importation of Budweiser into the Bahamas.

23. National Brands' interest in dealing with Todhunter-Mitchell is summarized in Florman's own words as follows in a March 9, 1970, report he sent to the Anheuser-Busch Legal Department in St. Louis:

"Pursuant to your conversation with Jerry Blank last Tuesday re: Toddhunter-Mitchell (sic) and Co., Ltd., I will try to search my memory and recap.

"Arthur Pincourt, (I believe he is Chairman of the Board of T. M. & Co.), made several approaches to me requesting us to sell him large quantities of Busch and Budweiser beers. This was followed by a number of 'phone calls from Kenneth Pincourt, (Arthur's son), who is president of T. M. & Co. Kenneth Pincourt told me they were buying truckloads of Bud and Busch and that we were quite follish not to sell them as it would be a convenience to them to purchase the beer from us at West Palm Beach, since they were shipping from West Palm Beach to Freeport where they are headquartered.

"I have known Arthur Pincourt for many years, and my relationship with Arthur and Kenneth had been friendly and cordial. I explained to the Pincourts that selling beer to them and

knowing that the beers would be shipped out of our territory into another distributors (sic) territory was against the Brewery's policy. However, through their ships chandler's operation, further, that they had interest in eight ships chandlering operations along the east coast and gulf coast. In addition, they belong to an association of ships chandlers that have pledged to help each other. In any event, they would be able to purchase Bud and Busch beers.

"In August, after the strike, Kenneth called me several times and wanted to purchase several truckloads of beer. Again, he repeated that he was getting the beer and it was foolish of us not to sell him. I called Bob Stockhausen in Atlanta and relayed this conversation to him. *'Stock' told me definitely not to sell T. M. & Co., that Anheuser-Busch was aware of the situation but did not know where the beer was coming from.* I suggested to Stockhausen that the source probably was T. M.'s ships chandler's operations in New Orleans, which, at the time, was a brewery operation. This was very disturbing to us because we could have been selling T. M. for several years, and didn't, and now T. M. was getting beer from a brewery branch operation during the time that we were short and on allocation.

"This brings us pretty much up-to-date. I have had several recent telephone calls, just social and friendly— the sort of thing like—'how about getting together when you are up this way'—(they maintain a West Palm Beach office).

"I am attaching copies of the correspondence that we have in our file. You will note in my letter of August 28th, that I make no mention of our products. In addition to these letters, there were several handwritten notes 'From the desk of A. Arthur Pincourt' requesting our getting together re: purchase of beer.

"If I can be of any further help, please advise.

"Sincerely," (Emphasis added.)

24. Todhunter-Mitchell's inability to purchase beer from National Brands stems directly from the refusal of Anheuser-Busch to approve such a sale to a distributor which is in direct competition with a duly-appointed Anheuser-Busch distributor in the Bahama Islands.

25. Anheuser-Busch, through its representatives, directed and ordered National Brands and A & B not to sell Budweiser to Todhunter-Mitchell. The refusal of Anheuser-Busch to allow the two distributors to sell beer in wholesale quantities to Todhunter-Mitchell for future resale in the Bahamas was motivated by an interest in eliminating all price competition for its products theretofore distributed and sold by Bahama Blenders, its duly-appointed distributor in the Bahama Islands.

26. In the four years before Martin retired, Anheuser-Busch had never had the problem in the Miami District of a wholesaler selling to somebody else's territory.

27. During Nesbitt's tenure as Division Manager at Tampa, there was only one situation other than the Todhunter-Mitchell situation where one Anheuser-Busch wholesaler sold in another's territory. It occurred when a tavern in the territory of the Orlando wholesaler, which had been sending its own truck to the Ocala wholesaler's place of business to buy beer, called up Nesbitt and sought permission to have the Ocala wholesaler deliver to the tavern in the Orlando wholesaler's territory. Nesbitt called the Orlando wholesaler and told him that the customer had no intention of buying from him and suggested that he contact the Ocala wholesaler to see if they could work out some sort of equitable agreement for further purchases of beer.

28. During the time that Stockhausen has been Regional Manager, Anheuser-

Busch wholesalers in that region have not sold in each other's territory.

29. Each wholesaler in the eastern region has a copy of the map of his designated territory.

30. Anheuser-Busch salesmen have access to the wholesaler's records which shows the names and addresses of the wholesaler's customers and the sales history of each account.

31. In Loyd's experience as Assistant to the Regional Manager, there was only one incident of a distributor in the eastern region servicing someone out of his territory. This happened when an eastern chain store which had one of its stores in a neighboring town elected to buy all of its beer from a smaller wholesaler in that neighboring town, trucking the beer back into Houston to its stores there. The wholesaler in Houston complained to Anheuser-Busch, after unsuccessfully trying to work the problem out with the smaller wholesaler. Anheuser-Busch personnel visited the smaller wholesaler. Thereafter, the smaller wholesaler did not sell beer to the Houston chain store.

*Findings of Fact as to Damages*

32. The time period in which damages have been sustained begins in February of 1969 and continues to the present. Todhunter-Mitchell attempted to purchase Budweiser beer from National Brands in February of 1969, but Anheuser-Busch prevented such a sale to the plaintiff. To date, Todhunter-Mitchell has been unable to purchase Budweiser from an Anheuser-Busch distributor in the United States.

33. If not precluded by the restraint imposed by Anheuser-Busch, plaintiff would have purchased wholesale quantities of beer from National Brands in Miami, Florida. Due to the close proximity of this wholesaler to the plaintiff's business in the Bahamas and the expressed interest of National Brands in selling beer to Todhunter-Mitchell, this distributor is the most logical source for the purchase of Budweiser by the plaintiff. The purchase of beer from the New Orleans distributor, through the plaintiff's wholly owned ship's chandler's business located there, represents a single, isolated transaction precipitated by the necessity of dispensing large quantities of beer diverted to the New Orleans wholesaler. Although further purchases from the New Orleans distributor by Todhunter-Mitchell was certainly possible, National Brands appears to be the most reasonable source of purchase of Budweiser by Todhunter-Mitchell.

34. National Brands' regular price to resellers for Budweiser from 1969 to the present has been $4.80 per case for no-return bottles and $4.95 per case for cans. These prices include Federal tax of $.65 per case and Florida State taxes of $.96 per case.

35. Absent the territorial restraints of National Brands, Todhunter-Mitchell would have purchased Budweiser from National Brands at the above-stated prices. There is no evidence on the present record in which the Court could reasonably conclude that National Brands would sell beer to Todhunter-Mitchell at prices different from those charged other purchasers.

36. Because the beer would be shipped out of the country, the $.65 per case Federal tax and $.96 per case state tax would not be applicable. For this reason, the total of $1.61 in taxes must be deducted from the prices charged by National Brands in computing Todhunter-Mitchell's lost profits. This reduction would establish a price of $3.19 per case for no-return bottles and $3.34 per case for cans.

37. The average price, computed by taking into account the Todhunter-Mitchell mix of cans and bottles, is $3.33 per case.

38. From February until July of 1969, the cost of ocean transportation, duty, and stamp tax totaled $1.17.

From August of 1969 to the present, this cost would amount to $3.17 per case.

39. In addition to the above-enumerated expenses, Todhunter-Mitchell would have incurred a selling and delivery cost of approximately $.25 per case. This figure is computed on the basis of Todhunter-Mitchell selling between 10,000 and 20,000 cases per year. This expense would be relatively constant over the five-year period in question here.

40. During the period of February to July of 1969, plaintiff's total cost of sales would have been $4.75 per case. From August of 1969 to the present, the total cost of sales would be $6.75 per case. The total cost of sales must be deducted from the selling price to determine lost profits per case.

41. The average price per case at which Todhunter-Mitchell would have sold Budweiser in the Bahamas is as follows:

| Period | Price Per Case |
|---|---|
| February to April, 1969 | $5.15 |
| May to July, 1969 | 5.26 |
| August, 1969 to December, 1970 | 8.24 |
| January to July, 1971 | 8.35 |
| August, 1971, to the present | 7.96 |

42. The total potential volume of sales of Budweiser by Todhunter-Mitchell for the relevant damage period is best represented by the volume of sales of Budweiser by Bahama Blenders during the same time period. Todhunter-Mitchell avers that it would have captured two-thirds of the Bahama Budweiser market, while the defendant argues that the plaintiff's share would have been limited to forty per cent (40%) of the Budweiser market. Neither party has introduced substantial or convincing evidence to support their respective positions. Based on testimony and extensive memoranda submitted throughout this litigation, the Court feels that an allocation to each party of fifty per cent (50%) of the Bahamian market for Budweiser is a reasonably accurate quotation of proportionate market potential. Both Todhunter-Mitchell and Bahama Blenders had been established and profitable wholesalers of beer, with extensive warehouse facilities and professional sales and advertising programs. Any competitive disadvantage experienced by Todhunter-Mitchell due to its late emergence onto the Budweiser market would be offset by the fact that Todhunter-Mitchell sold the beer on a retail basis at a slightly lower price than that charged by Bahama Blenders.

Bahama Blenders had a total Budweiser volume on Grand Bahama Island of approximately 50,000 cases in 1969; 42,200 cases in 1970; 21,200 cases in 1971; 17,000 cases in 1972; and projected sales of 17,000 cases in 1973, based on the 1971–1972 rate of sale. Allocating one-half of the Budweiser market to the plaintiff, the following scale represents the potential sales volume of Todhunter-Mitchell during the relevant periods herein discussed.

1969—25,000 cases
1970—21,000 cases
1971—10,600 cases
1972— 8,500 cases
1973— 8,500 cases

43. The following table embodies and incorporates the Court's findings of fact as to damages, as enumerated above:

| Period | Selling Price Per Case | Total Cost of Sales | Lost Profit Per Case | Cases Lost | Total Profit Lost |
|---|---|---|---|---|---|
| Feb.–April, '69 | $5.15 | $4.75 | $ .40 | 25,000 | $ 10,000 |
| May–July, '69 | 5.26 | 4.75 | .51 | 21,000 | 10,710 |
| Aug., '69–Dec., '70 | 8.24 | 6.75 | 1.49 | 10,600 | 15,794 |
| Jan.–July, '71 | 8.35 | 6.75 | 1.60 | 8,500 | 13,000 |
| Aug., '71–present | 7.96 | 6.75 | 1.21 | 8,500 | 10,385 |
| | | | | Total damages— | $ 59,889 |

Trebled, Todhunter-Mitchell's damages are ‑ ‑ ‑ $179,667

*Discussion*

### I.  Territorial Restraint

Section 1 of the Sherman Act, 15 U. S.C. § 1, provides that:

"Every contract, combination in the form of trust or otherwise, or conspiracy, in restraint of trade or commerce among the several States, or with foreign nations, is declared to be illegal. . . ."

Although the above statutory prohibition of contracts and combinations in restraint of trade is literally all-encompassing, this provision of the Sherman Act has been construed so as to preclude only those contracts or combinations which "unreasonably restrain competition." *Northern Pacific Railway Co. v. United States*, 356 U.S. 1, 78 S.Ct. 514, 2 L.Ed.2d 545 (1958). However, as the Supreme Court in *Northern Pacific* further indicated:

"There are certain agreements or practices which because of their pernicious effect on competition and lack of any redeeming virtue are conclusively presumed to be unreasonable and therefore illegal without elaborate inquiry as to the precise harm they have caused or the business excuse for their use . . ." 356 U.S. at p. 5, 78 S.Ct. at p. 518.

■ Some of the practices and agreements which are conclusively presumed to be illegal are those involving horizontal price-fixing. See, for example, United States v. Socony-Vacuum Oil Co., Inc., 310 U.S. 150, 223, 60 S.Ct. 811, 84 L.Ed. 1129 (1940); division of markets, see, for example, Addyston Pipe and Steel Co. v. United States, 175 U.S. 211, 20 S. Ct. 96, 44 L.Ed. 136 (1899); customer allocation and resale price maintenance, see, for example, Dr. Miles Medical Co. v. Park & Sons Co., 220 U.S. 373, 31 S. Ct. 376, 55 L.Ed. 502 (1911).

Todhunter-Mitchell alleges that the defendant's refusal to allow its two wholesale distributors, specifically National Brands and A&B, to sell Budweiser beer to be imported and sold by the plaintiff in the Bahama Islands constitutes a *per se* violation of Section 1 of the Sherman Act. The plaintiff further contends that Anheuser-Busch has imposed restrictions on the territory where, or persons to whom, its wholesalers in the Atlanta and Houston regions resell beer and that the imposition of such restrictions has such a serious anti-competitive effect so as also to be a *per se* violation of the antitrust laws in question herein.

■ The Court feels that the contentions of the plaintiff and the evidence adduced at trial present two separate and distinct issues with respect to alleged violations of the antitrust laws. The initial question is whether the restraint imposed on National Brands and A&B by Anheuser-Busch constitutes a *per se* violation of Section 1 of the Sherman Act. Secondly, and on a more general level, the Court must determine whether Anheuser-Busch has created and imposed a system of territorial restrictions through which the wholesalers in the Atlanta and Houston regions are effectively restrained from selling Budweiser beer outside of their respective designated territories. We consider first the defendant's refusal to sell Budweiser beer to Todhunter-Mitchell.

In the case of United States v. Arnold, Schwinn & Co., 388 U.S. 365, 87 S.Ct. 1856, 18 L.Ed.2d 1249 (1967), the Supreme Court held:

"Where a manufacturer *sells* products to his distributor subject to territorial restrictions upon resale, a *per se* violation of the Sherman Act results. And, as we have held, the same principle applies to restrictions of outlets with which the distributors may deal and to restraints upon retailers to whom the goods are sold. Under the Sherman Act, is it unreasonable without more for a manufacturer to seek to restrict and confine areas or persons with whom an article may be traded after the manufacturer has parted with dominion over it . . . Such restraints are so ob-

viously destructive of competition that their mere existence is enough." 388 U.S. at p. 379, 87 S.Ct. at p. 1865.

Although the Court in *Schwinn* condemned restrictions on the territory in which or the retailers to whom a wholesaler could resell as conclusively illegal, the decision must be read, as must all antitrust cases, in its factual context. Tripoli Company v. Wella Corporation, 425 F.2d 932, 936 (3rd Cir. 1970). The factual context of *Schwinn* involved the allocation of exclusive territories and the confinement of merchandise on resale to franchised dealers. The District Court found, and the Supreme Court agreed, that "Schwinn has been 'firm and resolute' in insisting upon observance of territorial and customer limitations by its bicycle distributors . . . and that Schwinn's 'firmness' in these respects was grounded upon the communicated danger of termination." 388 U.S. at p. 372, 87 S.Ct. at p. 1862. Schwinn, a leading bicycle manufacturer, advanced no considerations other than marketing and competition as justifications for the restraints imposed on the wholesalers. Absent any legitimate considerations or justification, the Court held the restraints on a system of distribution *per se* unlawful.

In regard to the restraint imposed on the Miami and New Orleans distributors, Anheuser-Busch argues that its refusal to sell Budweiser to Todhunter-Mitchell is motivated by considerations relating to quality control of the product and the shortage of beer caused by the 1969 strike of brewery employees. The defendant claims that the existence of the above considerations justifies its refusal to sell beer to Todhunter-Mitchell and, at the same time, renders inapplicable to this case the reasoning and decision of *Schwinn,* wherein no legitimate justifications were advanced.

This Court finds, as a matter of fact, that Anheuser-Busch has restrained the National Brands distributor in Miami and the A&B distributor in New Orleans from selling wholesale quantities of beer to Todhunter-Mitchell. Despite genuine attempts by Arthur and Kenneth Pincourt, Todhunter-Mitchell was repeatedly unable to purchase beer from National Brands. Because of the potential profit involved, National Brands wanted to sell beer to the plaintiff but was restrained from doing so by Anheuser-Busch. In addition to the direct restraint articulated and imposed by Anheuser-Busch personnel in the St. Louis home office, Bob Stockhausen, the Atlanta Regional Manager, also directed Martin Florman, the president of National Brands, not to sell Budweiser beer to Todhunter-Mitchell. In regard to Anheuser-Busch's distributor in New Orleans, Sparkman was likewise expressly instructed by Mr. Loyd not to sell any more beer for shipment to Todhunter-Mitchell in the Bahamas.

What transpired between Anheuser-Busch representatives and the two distributors falls squarely within proscriptions of Section 1 of the Sherman Act, as so clearly enunciated in United States v. Arnold, Schwinn & Co., *supra.* Based on a complaint received by Bahama Blenders concerning the unauthorized importation of Budweiser beer into the Bahamas and the interest of Anheuser-Busch in eliminating any significant price competition that would endanger the monopolistic position of Bahama Blenders in the Bahama Islands, the defendant unequivocally and emphatically directed the subject wholesalers not to sell Budweiser beer to Todhunter-Mitchell. National Brands and A&B have complied with such directives, thus effectively foreclosing Todhunter-Mitchell from purchasing Budweiser beer at wholesale prices in the United States. The restraint imposed by Anheuser-Busch constitutes a territorial restriction of the type condemned as *per se* violative of Section 1 of the Sherman Act by the Supreme Court in the *Schwinn* case.

■■ It has long been settled that an explict agreement is not a necessary part of a Sherman Act conspiracy, especially where joint and collaborative action is essential to the fulfillment of the intended scheme. United States v. Gen-

eral Motors, 384 U.S. 127, 142, 86 S.Ct. 1321, 1329, 16 L.Ed.2d 415 (1966). In the case at bar, there can be no doubt that the purpose and effect of the combination was to restrain trade and commerce within the meaning of the Sherman Act. As pointed out by the Court in the *General Motors* case, " . . . where businessmen concert their actions in order to deprive others of access to merchandise which the latter wish to sell to the public, we need not inquire into the economic motivation underlying their conduct." 384 U.S. at p. 146, 86 S.Ct. at p. 1331. The unlawful restraint of trade consisted of and was effectuated by the forceful directives of Anheuser-Busch and the immediate compliance therewith by National Brands and A&B.

The Court is convinced that the purported justifications advanced by Anheuser-Busch for its refusal to sell beer to Todhunter-Mitchell are, in reality, nonexistent. The efforts of Anheuser-Busch have been directed toward ensuring the continued economic success of Bahama Blenders. By preventing Todhunter-Mitchell from obtaining Budweiser beer at wholesale prices, all price competition is effectively eliminated.

Anheuser-Busch's principal argument in support of the legality of the restrictions is that the brewery was concerned about the quality of the product to be sold to the consumer. The defendant's alleged concern was primarily based on the loss of control over the distribution of beer and the possibility of stale beer in a particular market. Another reason advanced by the defendant is that the breweries were experiencing a beer shortage due to a 1969 employee strike and that rationing, not increased sales, was necessary.

The Court finds unconvincing the argument that the country's largest brewer of beer, with 950 wholesalers located across the Nation and with 1971 sales of over 24,000,000 barrels of beer (representing a total sales volume of over $832,183,000), would undertake the frenzied efforts detailed herein to prevent one distributor from obtaining Budweiser beer based on considerations of under-supply and quality control. An examination of the evidence adduced at trial, specifically the letters and memoranda sent and received by Anheuser-Busch supervisory personnel, failed to reveal any significant concern about shortages or over-aged products. For example, in Nesbitt's letter to Regional Manager Stockhausen, the Division Manager wrote, "The Tod-Hunter (sic) Company is selling the Budweiser and the Busch at the same price, which is $7.75 [per case]. This is 50¢ under the Bahamas Blenders price on Budweiser." Jaffrey Stewart, the manager of Bahama Blenders, filed a written complaint with Nesbitt requesting an immediate investigation and stating, " . . . we are in an invidious position having a *bootlegger* in the area supplying our customers with product at prices below those set by your wholesaler." (Emphasis added.) Another interesting communication was sent by Robert Stockhausen to Mr. Aulbert, vice president of Marketing, in which he wrote, "We look upon this as a very serious matter and will appreciate any help you can provide in attempting to curtail the availability and shipment to the Bahamas." Finally, in Martin Florman's letter to the Anheuser-Busch legal department of March 9, 1970, he wrote that he explained to Pincourt that "selling beer . . . and knowing that the beers would be shipped out of our territory into another distributors (sic) territory was against the Brewery's policy." In this same letter was Florman's reference to the conversation with Robert Stockhausen in which "Stock" told Florman definitely not to sell to Todhunter-Mitchell. The course of conduct engaged in by Anheuser-Busch personnel in an attempt to locate the source of the beer being sold by Todhunter-Mitchell is not consistent with acceptable and appropriate corporate behavior undertaken to ensure an objective of long-range quality control.

The proof introduced at trial conclusively established the anti-competitive purpose and effect of the restraint im-

posed by Anheuser-Busch. Having no justification other than marketing and competitive considerations, the restrictions on where and to whom the Miami and New Orleans wholesalers may resell their products falls squarely within the proscriptions of United States v. Arnold, Schwinn & Co., *supra*, and must be deemed a *per se* violation of the antitrust laws.

II. *Admissibility of the Deposition Testimony of Arthur Pincourt, Sr.*

The plaintiff introduced certain portions of the deposition testimony of Arthur Pincourt, Sr., which testimony concerned Mr. Pincourt's conversations with Messrs. Florman and Blank of National Brands, in which Florman and Blank explained to Pincourt that Mr. Busch had been approached but had positively vetoed the sale of Budweiser to plaintiff. The defendant argues that Todhunter-Mitchell cannot rely on testimony of one of its officers reporting on conversations with Blank and Florman which, in turn, reported upon alleged conversations with Mr. Busch. The contested testimony relates to the reasons upon which Mr. Busch based his refusal to deal with Todhunter-Mitchell, as communicated to Florman and Blank of· National Brands. Mr. Busch reportedly stated to these men that they could not sell beer to Todhunter-Mitchell in the Bahamas because Anheuser-Busch already had a distributor in the Bahamas (Bahama Blenders) that was entitled to be protected.

■■ It is elementary law that once an unlawful agreement is established by independent evidence the hearsay declarations of confederates may be used to bind all members of the conspiracy. Rutledge v. Electric Hose and Rubber Company, 327 F.Supp. 1267, 1274 (C.D.Cal. 1971); United Statss v. Johns-Manville Corporation, 231 F.Supp. 690 (E.D.Pa. 1963). Sufficient evidence, independent of the statements of Florman and Blank, was introduced to establish an unlawful conspiracy in restraint of trade. The statements of Florman and Blank to Pincourt, though hearsay, are admissible

evidence against Anheuser-Busch, a defendant/co-conspirator.

Moreover, the reasons expressed by Florman and Blank for not being able to sell Budweiser to Todhunter-Mitchell are extremely relevant to the disposition of this case. Due to the nature of the allegations contained in this law suit, it is of crucial significance for the Court to determine why National Brands could not sell the 10,000 cases of Budweiser beer as requested by Todhunter-Mitchell. After initially expressing considerable interest in consummating such a transaction, National Brands thereafter retreated and informed Todhunter-Mitchell that the sale could not be made. The Court believes that the probative value of Pincourt's testimony concerning his conversations with Florman and Blank where they related the reasons given them by Mr. Busch for blocking the sale of beer far outweighs a claim of unreliability of the statements because they may be deemed hearsay.

III. *Jurisdiction Under the Sherman Act*

■ Defendant contends that the authority of the Sherman Act should not be applied to grant relief to a foreign corporation for alleged damage to its business in a foreign country. The Court is cautioned that the promotion of intraband competition in a foreign country must be outside the concern of the antitrust laws of the United States.

Todhunter-Mitchell is indeed a Bahamian corporation primarily engaged in the distribution of alcoholic beverages and beer in the Bahama Islands. This fact alone should not deprive it of the means to obtain relief otherwise available under the applicable provisions of the Sherman Act. The defendant is a corporate citizen of the State of Missouri, just as the wholesale distributors with whom the defendant conspired are corporate citizens of their respective states within the United States in which they are located. Moreover, the acts which constitute the antitrust violation complained of herein occurred primarily in the United States.

The case of Joseph Muller Corp. Zurich v. Societe Anonyme de Gerance, 451 F.2d 727 (2nd Cir. 1971), involved a treble damage action under the Sherman Act brought by a Swiss corporation against a French corporation. The court declined to dismiss the antitrust suit, relying to a considerable degree on the fact that the defendant had "offices in the United States . . . the overt acts [and] meetings involved in the anti-trust claim occurred largely within the United States and the trade and commerce in the commodity involved originated in the United States . . ." 451 F.2d at p. 729. *In accord,* Pacific Car and Foundry Company v. Pence, 403 F.2d 949 (9th Cir. 1968).

The holding of the court in State of Kuwait v. Charles Pfizer & Co., Trade Regulation Reporter ¶ 74,000,166 (S.D. N.Y.1972), lends further support to the court's decision affirming the right of Todhunter-Mitchell to institute suit under the antitrust laws in the United States District Court. Kuwait brought an antitrust action against domestic producers of antibiotic drugs under Section 4 of the Clayton Act, 15 U.S.C. § 15. Interpreting 15 U.S.C. § 15, the court therein held that a foreign nation is a "person within the meaning of our antitrust laws and thus entitled to sue for treble damages based on purchases made by it." The court indicated that it could "perceive no reason for believing that Congress wanted to deprive a foreign nation of the civil remedy of treble damages which is available to other *foreign purchasers* who suffered through violation of the Act." (Emphasis added.) Under the facts of this case, the foreign citizenship of Todhunter-Mitchell does not preclude such corporation from bringing suit under §§ 15 and 26 of 15 U.S.C.

IV. *Allegations Concerning the Imposition of Territorial Restrictions in the Houston and Atlanta Sales Regions*

■ We now consider Todhunter-Mitchell's allegation that the defendant has imposed territorial restrictions on those wholesalers who distribute Anheuser-Busch in the Houston and Atlanta regions. The thrust of plaintiff's claim is that Anheuser-Busch has effectively restrained its distributors from selling and delivering beer outside of certain geographical areas which have been fashioned and allocated by the defendant, Anheuser-Busch. In support of the above contention, plaintiff cites the existence of maps delineating geographical boundaries which are in the possession of the distributors, the fact that Anheuser-Busch salesmen have access to the sales records of the major beer distributors, and a series of unrelated incidents in which Anheuser-Busch representatives intervened to resolve disputes among wholesalers involving the sale of beer to purchasers not located in the selling party's specified area. Plaintiff further relies on Anheuser-Busch's refusal to sell beer for shipment to Todhunter-Mitchell as evidence of the territorial restrictions that exist in the Houston and Atlanta regions. Defendant concedes for the purpose of this litigation that its marketing division has created primary areas of responsibility in which its wholesalers are encouraged to operate in the resale of Anheuser-Busch products. However, the defendant denies the existence of restrictions on where or to whom its wholesalers may resell beer. After thorough and careful consideration of the evidence adduced at the trial of this matter, the Court is of the opinion that the plaintiff has failed to establish by a preponderance of the evidence the imposition in the general Houston and Atlanta regions of territorial restrictions of the type and degree condemned in United States v. Arnold, Schwinn & Co., *supra.* To be sure, some evidence of restraints on extra-territorial business has been presented; however, in the *Schwinn* case, the Supreme Court stated:

"Schwinn has been 'firm and resolute' in insisting upon observance of territorial and customer limitations . . . and that Schwinn's 'firm-

ness' in these respects was grounded upon the communicated danger of termination." 388 U.S. at p. 372, 87 S. Ct. at p. 1862.

Unlike the specific issue regarding the defendant's refusal to allow beer to be sold to Todhunter-Mitchell in the Bahamas, there is not sufficient evidence in the record from which the Court could reasonably conclude that Anheuser-Busch was "firm and resolute" in demanding adherence to territorial restrictions on the part of its wholesalers. The record is devoid of any evidence indicating that Anheuser-Busch exerted coercions upon or communicated threats of termination to the distributors in the Atlanta and Houston regions. Evidence of the infrequency of extra-territorial sales and the cooperation of Anheuser-Busch executive personnel in the resolution of disputes among its distributors does not give rise to a *per se* violation of Section 1 of the Sherman Act.

■ The Court is cognizant of the well-settled legal precept that, because of the difficulty of proof, the essential agreement or combination to restrain trade may be established by circumstantial evidence or inferences drawn from the course of conduct of the alleged conspirators. Interstate Circuit v. United States, 306 U.S. 208, 221, 59 S.Ct. 467, 472, 83 L.Ed. 610 (1939); Frey & Son v. Cudahy Packing Co., 256 U.S. 208, 210, 41 S.Ct. 451, 453, 65 L.Ed. 892 (1921). Nonetheless, that principle cannot fill the evidentiary void here inasmuch as the evidence introduced by Todhunter-Mitchell is wholly insufficient as a matter of law to establish a *per se* violation of the Sherman Act in connection with the alleged territorial restrictions in the Houston and Atlanta sales regions.

### V. *Relief*

#### (1) *Injunction*

■ The Court has heretofore found that Anheuser-Busch's refusal to allow National Brands and A&B to sell Budweiser beer to the plaintiff constitutes a *per se* violation of Section 1 of the Sherman Act. The Court also concludes that, absent injunctive relief, defendant will continue to violate the antitrust laws by refusing to sell Budweiser beer to Todhunter-Mitchell. In order to prevent threatened economic injury caused by the continued violation of Section 1 and as a reasonable method of enforcing the antitrust laws, an injunction will be granted enjoining the defendant from restraining any of its duly-authorized or appointed wholesalers from selling Anheuser-Busch products on customary and nondiscriminating terms to Todhunter-Mitchell & Co., Ltd. See, Zenith Corp. v. Hazeltine, 395 U.S. 100, 130, 89 S.Ct. 1562, 23 L.Ed.2d 129 (1969); United States v. Oregon Med. Soc., 343 U.S. 326, 72 S.Ct. 690, 695, 96 L.Ed. 978 (1952).

#### (2) *Damages*

Section 4 of the Clayton Act, 15 U.S. C. § 15, provides for the following award of damages to private antitrust plaintiffs:

> "Any person who shall be injured in his business or property by reason of anything forbidden in the antitrust laws . . . shall recover threefold the damages by him sustained, and the cost of suit, including a reasonable attorney's fee."

■ Although it must be established that the business injury sustained is directly attributable to the antitrust violation, Hanover Shoe, Inc. v. United Shoe Machinery Corp., 377 F.2d 776 (3rd Cir. 1967); Hobart Brothers Co. v. Malcolm T. Gilliland, Inc., 471 F.2d 894 (5th Cir. 1973), the amount of damages need not be established by precise and definite proof. Zenith Corp. v. Hazeltine, *supra*; Locklin v. Day-Glo Color Corporation, 429 F.2d 873 (7th Cir. 1970), cert. denied, 400 U.S. 1020, 91 S.Ct. 584, 27 L.Ed.2d 632 (1971). Once causation in an antitrust violation has been established, the fact finder is permitted to make a "just and reasonable estimate of the damage based on relevant data." Bigelow v. RKO Radio Pictures, 327 U.

S. 251, 264, 66 S.Ct. 574, 580, 90 L.Ed. 652 (1946). As expressed by the Supreme Court in *Zenith*:

> "Trial and appellate courts alike must also observe the practical limits of the burden of proof which may be demanded of a treble-damage plaintiff who seeks recovery for injuries from a partial or total exclusion from a market; damage issues in these cases are rarely susceptible of the kind of concrete, detailed proof of injury which is available in other contexts . . ." 395 U.S. at 123, 89 S.Ct. at 1576.

■ Plaintiff's continuous inability to purchase wholesale quantities of Budweiser beer for resale in the Bahamas and the consequent economic injury is directly attributable to the antitrust violation herein established. The fact of damages having been established, the Court, as the fact finder, must ascertain a "just and reasonable estimate" of the damages based on the relevant data presented. The total damages sustained by Todhunter-Mitchell consists of lost profits on the beer that could have been sold on a retail basis in the Bahamas, but for the antitrust violation of Anheuser-Busch. As indicated in the Court's findings of facts, the lost profits are computed by multiplying the projected number of cases of beer that would have been sold, absent the violation by the amount of profit Todhunter-Mitchell would have made on each case sold. The profit figure on each case is computed by subtracting the incremental cost of selling the beer from the actual selling price. Only the variable expenditures that Todhunter-Mitchell would incur in selling the Budweiser beer are embodied in the cost of sale; fixed cost, such as insurance, amortization, and retirement of long-term debt, are not considered in determining the cost of selling the beer. N. W. Controls, Inc. v. Outboard Marine Corporation, 333 F.Supp. 493, 525 (Del.1971).

■ The Court is convinced that the figures and totals contained in the findings of fact 32 to 43, inclusive, represent a fair and reasonable estimate of the damages sustained by Todhunter-Mitchell. The findings in connection with the projected volume of sales are reasonable estimates based on testimony and data supplied by the litigants.

*Conclusions of Law*

(1) The Court has jurisdiction of the parties and of the subject matter pursuant to 15 U.S.C. §§ 15 and 26.

(2) Since the beginning of 1969 and continuing to the present time, Anheuser-Busch has restrained its Miami and New Orleans wholesalers, specifically National Brands in Miami and A&B in New Orleans, from reselling Anheuser-Busch beer to Todhunter-Mitchell. This restraint imposed on National Brands and A&B by Anheuser-Busch, which effectively precluded Todhunter-Mitchell from purchasing wholesale quantities of Budweiser beer in the United States, constitutes a *per se* violation of Section 1 of the Sherman Act.

(3) The violation of Section 1 of the Sherman Act by Anheuser-Busch has directly caused Todhunter-Mitchell to suffer substantial economic and competitive damages in the sale of beer on the Bahama Islands. In view of the extent and nature of the damages sustained, Todhunter-Mitchell is entitled to single damages of $59,889, which when trebled amount to $179,667; injunctive relief in the form outlined heretofore in this Court's Opinion; and, costs and reasonable attorney's fees.

(4) Although Anheuser-Busch has devised and, in some respects, has encouraged a distribution system whereby duly-appointed Anheuser-Busch wholesalers sell beer only in their primary areas of marketing responsibility, this Court is unable to conclude, as a matter of law, that Anheuser-Busch has imposed and has enforced a system of territorial restrictions on such wholesalers, in violation of Section 1 of the Sherman Act.