**TRABERT & HOEFFER, INC., an Illinois Corporation, Plaintiff–Appellee,**

v.

**PIAGET WATCH CORPORATION, North American Watch Corporation and Concord Watch Corporation, Defendants–Appellants.**

No. 80–1081.

United States Court of Appeals, Seventh Circuit.

Argued June 9, 1980.

Decided July 29, 1980.*

---

* This appeal was originally decided by unreported order on July 29, 1980. See Circuit Rule 35. The Court has subsequently decided to issue the decision as an opinion.

Ronald J. Greene, Washington, D. C., for defendants–appellants.

James S. Gordon, Chicago, Ill., for plaintiff–appellee.

Before SWYGERT and WOOD, Circuit Judges, and LARSON, Senior District Judge.**

PER CURIAM.

Defendants–appellants North American Watch Corporation and two subsidiaries, Piaget Watch Corporation and Concord Watch Corporation, appeal from a judgment below finding them liable under section 1 of the Sherman Act, 15 U.S.C. § 1.

** The Honorable Earl R. Larson, Senior District Judge of the District of Minnesota, is sitting by designation.

The district court, Judge Grady presiding, found that the defendants ceased to supply watches for resale to plaintiff Trabert & Hoeffer, Inc., a jewelry retailer, pursuant to a price–fixing agreement between defendants and plaintiff's competitors. The case was tried without a jury; voluminous documentary evidence was viewed by the district court and extensive testimony heard. The court, in addition to awarding the plaintiff $195,000 in treble damages and $43,695.10 in costs and legal fees, permanently enjoined defendants from refusing to deal with the plaintiff on the same terms and conditions (*i. e.*, availability, price, credit, service, advertising coverage) enjoyed by other Chicago area retailers supplied by the defendants.

On appeal, the defendants urge reversal on three grounds: (1) the district court erred in finding that the defendants engaged in a price–fixing conspiracy; (2) the damages award was in error because neither the fact nor degree of damage was supported by the evidence; and (3) the injunctive relief ordered by the district court exceeded its discretion. Although the appeal was ably argued, we find no reversible error and so affirm with a slight modification of the injunctive order.

I.

The appellants first contend that there was insufficient evidence in the record to permit the court's finding of a price–fixing conspiracy. It is important to note at the outset that this court can upset the lower court's finding of an agreement only if it was clearly erroneous; we are not to weigh complicated antitrust evidence *de novo*, and we are obligated to defer to the trier of fact on such matters as witness credibility. *Zenith Radio Corp. v. Hazeltine Research Inc.*, 395 U.S. 100, 123, 89 S.Ct. 1562, 1576, 23 L.Ed.2d 129 (1969); *City of Mishawaka v. American Electric Power Co., Inc.*, 616 F.2d 976, 979 (7th Cir. 1980), *cert.*

*filed*, 49 U.S.L.W. 3009 (June 27, 1980). Further, in reviewing the record, we must keep in mind that the elements of a Sherman Act violation are met in a vertical price restraint conspiracy when there is evidence of more than a unilateral announcement of restriction by the wholesaler and voluntary adherence by the retailer. *United ed States v. Bausch & Lomb Optical Co.*, 321 U.S. 707, 723, 64 S.Ct. 805, 813, 88 L.Ed. 1024 (1944). The presence of some "affirmative action to achieve uniform adherence by inducing each customer to adhere to avoid ... price competition ...," *United States v. Parke, Davis & Co.*, 362 U.S. 29, 47, 80 S.Ct. 503, 513, 4 L.Ed.2d 505 (1960), is sufficient additional evidence. But to establish liability, direct evidence of an agreement need not be shown; it is permissible to reasonably infer the existence of a conspiracy from the defendant's conduct. *United States v. Paramount Pictures, Inc.*, 334 U.S. 131, 142, 68 S.Ct. 915, 921, 92 L.Ed. 1260 (1948); *Interstate Circuit, Inc. v. United States*, 306 U.S. 208, 221, 59 S.Ct. 467, 472, 83 L.Ed. 610 (1939).

Within these limits, we are unable to conclude that Judge Grady's findings were clearly erroneous. The district court found on the basis of credible testimony that the defendants had received numerous complaints from plaintiff's retail competitors regarding the plaintiff's practice of discounting defendants' product lines, that the defendants agreed with the plaintiff's competitors to redress such complaints by seeking a curtailment of plaintiff's practices, and that when voluntary adherence was not forthcoming from the plaintiff, the defendants terminated plaintiff's supply of watches, with the express explanation that such termination was due to the plaintiff's putatively excessive discounting.

More specifically, the plaintiff's President, Donald Levinson, testified that Maurice Schilling, a sales representative of defendants, began in early 1974 to urge plaintiff to restrict its discounts in excess of 20% on the exclusive Piaget watch line. Schilling explained that his warning was a response to complaints from other retailers whose businesses could only support a 20% discount. Levinson was induced to sign a letter in September 1974, later repudiated, in which he agreed to reduce his discounts. When plaintiff resumed its discounting practices, Schilling again warned plaintiff in 1976 of complaints from plaintiff's competitors and hinted at termination if the discounting practices were not ended. When plaintiff refused to comply, defendants became uncooperative with plaintiff, refusing to supply immediate shipment of customer orders and ending delivery of watches on consignment.

In early 1978, according to the testimony of one of plaintiff's competitors, Schilling answered his complaints and plea for price "protection" with a commitment to "firm up the market." This competitor indicated to Schilling that he would not discount the company's line in excess of 20% if the defendants would enforce a no-discount policy against competing retailers; Schilling agreed to these terms. A similar promise to take the defendants' watch line out of the hands of excessive discounters was made by Schilling to another of Trabert & Hoeffer's competitors in response to complaints.

Levinson further testified that contemporaneously, he was unable to secure from the defendants either watches or an explanation of why his supply had been curtailed. After numerous unreturned telephone calls, Schilling finally told Levinson in June 1978 that his dealership had been eliminated because of pressure from plaintiff's competitors and Levinson's refusal to adhere to the 20% maximum discount. While contradictory testimony was offered by defendants' senior vice president as to the reasons for plaintiff's termination, the court found this testimony to be unreliable in view of the witness' unfamiliarity with the Trabert & Hoeffer dealership and his inability to provide a consistent counter-explanation for the termination. The court, as permitted under *Interstate Circuit v. United States*, 306 U.S. at 221, 59 S.Ct. at 472, also drew an adverse inference from Schilling's non-appearance at trial despite plaintiff's re-

quest that he testify. Noting the evidence of repeated and widespread complaints to the defendants by plaintiff's competitors and of Schilling's agreement to eliminate discounting, Schilling's warnings of termination if Trabert & Hoeffer continued its discounting, the subsequent noncooperation and termination of plaintiff unaccompanied by any credible business explanation, and Schilling's nonappearance at trial, the district court concluded that defendants' actions violated the Sherman Act's price–fixing prohibition.

■ The defendants seek reversal of the liability finding on the basis of several errors of law in Judge Grady's conclusions. First, appellants assert generally that under this court's decision in *Lamb's Patio Theatre, Inc. v. Universal Film Exchanges, Inc.*, 582 F.2d 1068 (7th Cir. 1978) (per curiam), and under *First National Bank of Arizona v. Cities Service Co.*, 391 U.S. 253, 88 S.Ct. 1575, 20 L.Ed.2d 569 (1968), they have a right to sell to whomever they please and therefore a Sherman Act court is not permitted to infer a conspiracy from a unilateral termination which might have been undertaken for non–conspiratorial, even illegitimate, business · reasons. Appellants err, however, in reading these cases too broadly. *Lamb's Patio Theatre* involved an allegedly conspiratorial refusal by a film distributor to accept the plaintiff's bid for a film showing; summary judgment was granted to defendant because plaintiff had failed to produce any evidence of a conspiracy apart from the weakness of the defendant's proffered explanation. In the present case, by contrast, the record contained a plethora of additional evidence probative of the existence of a conspiracy: Levinson's testimony as to Schilling's repeated warnings and his explanation of the termination,

the testimony concerning the agreements between Schilling and Trabert & Hoeffer's competitors, and the furtive circumstances of the termination. In *First National Bank of Arizona*, 391 U.S. 253, 277, 88 S.Ct. 1575, 20 L.Ed.2d 569, the Supreme Court merely held any inference of conspiracy from the defendant's refusal to deal to be overcome by a more probable evidence–based inference of innocent motive. Here, the district court found the evidence insufficient to support such a countervailing inference. Instead, this case involves a history of explicit threats and agreements by the defendants to restrain price competition coupled with an unsatisfactorily explained refusal to deal. While the law recognizes that a manufacturer has a right to sell to whom it pleases, this court has held this right to be neither absolute nor exempt from regulation. "If it is accompanied by unlawful conduct or agreement, or conceived in monopolistic purpose or market control, the right is deemed to have transgressed the [Sherman] act." *Fontana Aviation, Inc. v. Beech Aircraft Corp.*, 432 F.2d 1080, 1085 (7th Cir. 1970), *cert. denied*, 401 U.S. 923, 91 S.Ct. 872, 27 L.Ed.2d 826 (1971).[1]

■ The appellants next assert that because some further discounting in excess of 20% continued after the plaintiff's termination, the court below erred in enjoining the price–fixing agreement. This contention may be disposed of quickly, for a vertical price–fixing conspiracy is clearly a *per se* violation of the Sherman Act and once there is ample evidence from which to infer a conspiracy, evidence of continuing price competition will not ordinarily negate such an inference. *United States v. Socony–Vacuum Oil Co.*, 310 U.S. 150, 220, 60 S.Ct.

1. Pursuant to Rule 11 of this court and Rule 28(j) of the Federal Rules of Appellate Procedure, the appellants have further cited the recent decision in *Borger v. Yamaha International Corp.*, 625 F.2d 390 (2d Cir. 1980). The court in *Borger*, reversing on other grounds the finding of Sherman Act liability, merely noted that the jury should have been instructed that standing alone a defendant's mere consultation with plaintiff's prospective competitors before declining to offer plaintiff a franchise did not establish a conspiracy to effect the questioned restraint, *i. e.*, a boycott. As noted above, the district court here, acting consistently with the *Borger* caveat, based its liability finding on evidence of explicit agreements, beyond mere consultation and complaint–hearing, between defendants and plaintiff's competitors to effect the proven restraint, *i. e.*, price–fixing.

811, 842, 84 L.Ed. 1129 (1940); *United States v. Trenton Potteries Co.*, 273 U.S. 392, 397–98, 47 S.Ct. 377, 71 L.Ed. 700 (1927).

■ The defendants further argue that the court improperly relied upon evidence of the defendants' discussion of competing retailers' complaints in inferring an illegal conspiracy, citing *Carbon Steel Products Corp. v. Alan Wood Steel Co.*, 289 F.Supp. 584 (S.D.N.Y.1968), and *Klein v. American Luggage Works, Inc.*, 323 F.2d 787 (3d Cir. 1963). Both cases are readily distinguishable from the case at bar. In *Carbon Steel*, the court found no evidence that the customer complaints were acted upon as part of the "enforcement machinery" of a general policy against plaintiff's practices. *Carbon Steel*, 289 F.Supp. at 588. Here, however, there was ample evidence in the record to permit a finding that the complaints of Trabert & Hoeffer's competitors were acted upon and were in fact the major impetus for defendants' discount–limitation policy. In *Klein*, the court refused to infer a conspiracy from competitors' complaints where there was an absence of evidence that the complaints were directed towards a particular retailer or reported to the wholesaler. *Klein*, 323 F.2d at 789, 791. Here there is ample evidence to support a finding that the complaints were precisely concerned with Trabert & Hoeffer's practices, that they became the basis of defendants' decision–making and were thus highly relevant to the district court's liability inquiry.

Defendants finally challenge the weight attached by the court below to Levinson's testimony regarding Schilling's reasons for the termination, arguing that such testimony is hearsay although admissible and was contradicted by the direct testimony of one of the defendants' vice–presidents.[2] In the sole case relied on by defendants to attack the weight accorded these statements, *Garrett's Inc. v. Farah Manufacturing Co., Inc.*, 412 F.Supp. 656, 660 (D.S.C.1976), defendant's agent took the stand to make an express denial of the statement attributed to

him; although called as a witness here, Schilling did not take the stand to refute Levinson's testimony.

In sum, the defendants' refutation of the court's liability finding amounts to little more than a series of attacks on isolated, abstracted quanta of the fact–finding process. However, considering as a whole the court's observation of witness demeanor, the evidence of repeated threats and actions directed towards the plaintiff, and defendants' contemporaneous agreements with plaintiff's competitors, we are convinced that the district court's finding of antitrust liability was not clearly erroneous.

## II.

Appellants next challenge the treble damage award, contending that the evidence supports neither the finding of actual damage to the plaintiff nor the finding of the amount of damage sustained. We find the first contention to be conceptually misdirected and the second to be meritless in light of the record.

### A. FACT OF DAMAGE

■ To support its assertion that no damage resulted from the termination of watch supplies to Trabert & Hoeffer, defendants first point to an absence of evidence that no comparable substitute watches were available to replace lost inventory. But this argument runs counter to the cases involving the enforcement of intrabrand price restraint which hold that harm is established by the termination itself, which eliminates the plaintiff's ability to compete on the intrabrand market. *Cernuto, Inc. v. United Cabinet Corp.*, 595 F.2d 164, 166 (3d Cir. 1979); *Todhunter–Mitchell & Co., Ltd. v. Anheuser–Busch, Inc.*, 375 F.Supp. 610, 627 (E.D.Pa.1974), *modified*, 383 F.Supp. 586 (E.D.Pa.1974).

■ Even if the termination did not constitute an automatic injury to Trabert & Hoeffer, there is ample evidence in the record to support a finding that the procuring

---

**2.** Defendants' characterization of this testimony as admissible hearsay is not accurate. Under rule 801(d)(2) of the Federal Rules of Evidence such a statement is not hearsay.

of substitutes would not have ameliorated the immediate losses suffered. Plaintiff's president and competing retailers testified that the terminated product lines enjoyed powerful name brand identification with customers, partly as a result of defendants' multimillion dollar advertising program. Plaintiff and others testified that it was important for image purposes to have their stores associated with such a product line. Levinson further testified that Trabert & Hoeffer experienced a loss of goodwill from customers as a result of the loss of defendants' products. As this court observed in a similar intrabrand conspiracy resulting in a retailer's termination, "we are in a day and age in which the value of the nationally advertised franchise is a matter of general recognition. If [plaintiff] were deprived of the dealership (or franchise right) as a result of an illegal conspiracy, some damage would appear to be implicit." *Fontana Aviation, Inc. v. Beech Aircraft Corp.*, 432 F.2d at 1086. The case urged upon us by appellants, *Elder–Beerman Stores Corp. v. Federated Department Stores, Inc.*, 459 F.2d 138 (6th Cir. 1972), is not to the contrary. The *Elder–Beerman* court merely demanded evidence of the non–fungibility of the terminated product line where the alleged market restraints were not *per se* violations of the Sherman Act but were required to pass a "reasonableness" threshold; there was also lacking in the *Elder–Beerman* case any substantial evidence of the uniqueness of the brands denied. *Id.* at 144, 149. Both a *per se* violation and strong evidence of product uniqueness are present here.

The second prong of the appellant's attack on the district court's finding of the fact of damage argues that the court failed to consider plaintiff's entire business operation in determining loss as required under *Flintkote Co. v. Lysfjord*, 246 F.2d 368, 393 (9th Cir.), *cert. denied*, 355 U.S. 835, 78 S.Ct. 54, 2 L.Ed.2d 46 (1957); *Wolfe v. National Lead Co.*, 225 F.2d 427, 430 (9th Cir.), *cert. denied*, 350 U.S. 915, 76 S.Ct. 198, 100 L.Ed. 802 (1955); and *Borger v. Yamaha International Corp.*, 625 F.2d 390 (2d Cir. 1980). These cases are inapposite. *Flintkote* merely rejected any attempt by plaintiffs to prove damage to an entire new business on the basis of only one segment of a business in which they had been previously involved. 246 F.2d at 393. Here, by contrast, plaintiffs seek only to establish a comparison between the past and future profitability of a single product line. *Wolfe* simply demanded a financial reckoning of the entire corporation where the plaintiffs proffered an unorthodox damage theory hinging explicitly on the non–profitability of their total business operation in comparison with the success of the disputed product line. 225 F.2d at 430. Trabert & Hoeffer has invoked no such comparison in this case to establish damage. Finally, in *Borger* the court reversed a damage award that failed to consider the extent to which the plaintiff's losses due to its inability to obtain the disputed product were offset by increased sales in other lines. Evidence in the present case, however, indicated that the clientele desiring the disputed watches was discrete and strongly loyal to the denied brand, and could seldom be persuaded to make a substitute purchase from plaintiff. In any event, the favored method of ascertaining damage in antitrust litigation is to consider only that product line or market in which the plaintiff suffered injury rather than plaintiff's entire business. *Zenith Radio Corp. v. Hazeltine Research, Inc.*, 395 U.S. 100, 89 S.Ct. 1562, 23 L.Ed.2d 129; *Todhunter–Mitchell*, 375 F.Supp. at 619–20.

In short, the fact of damage in a refusal to deal case may be inferred from a showing of a decline in profits or earnings which proximately resulted from defendant's wrongful acts. *Zenith*, 395 U.S. at 123; *Todhunter–Mitchell*, 375 F.Supp. at 627; *Klein v. American Luggage Works, Inc.*, 206 F.Supp. 924, 944 (D.Del.1962), *rev'd on other grounds*, 323 F.2d 787 (3d Cir. 1963). The evidence in the record easily exceeds such a threshold.

## B. AMOUNT OF DAMAGES

In order to determine the extent of the damage suffered by Trabert & Hoeffer as a result of the defendants' actions, the dis-

trict court reviewed extensive and detailed documentary evidence; plaintiff's past sales volume; inventory costs; annual purchases from defendants; revenues; gross profits and gross profits as a percentage of sales on those purchases; and the impact of defendants' advertising on plaintiff's sales. Detailed and alternate projections of future sales and profits were scrutinized and estimates calculated therefrom. Despite this meticulous sifting of the statistical evidence, appellants now contend that the district court's findings were impermissibly based on speculation and conjecture.

 It is axiomatic that damages in this type of case are rarely susceptible of the kind of concrete, detailed proof of injury available in other contexts. *Zenith*, 395 U.S. at 123, 89 S.Ct. at 1576. Furthermore, a defendant whose wrongful conduct has rendered difficult the ascertainment of precise damages suffered by the plaintiff is not entitled to complain that they cannot be measured with the same exactness and precision as would otherwise be possible. *Eastman Kodak Co. v. Southern Photo Materials Co.*, 273 U.S. 359, 379, 47 S.Ct. 400, 405, 71 L.Ed. 684 (1927). This court has unambiguously held that in its damage assessment, the "fact finder may act on probability and inference .... Even though we may not agree with each step in the [fact finder's] reasoning process, we must affirm ... unless the findings are beyond the pale of sane judgment." *Locklin v. Day Glo Color Corp.*, 429 F.2d 873, 880 (7th Cir. 1970), *cert. denied*, 400 U.S. 1020, 91 S.Ct. 582, 27 L.Ed.2d 632 (1971). With these decisions as our guide, we do not hesitate to affirm the lower court's quantification of damages.

 In protest, defendants point to the district court's use of plaintiff's projected gross profits, rather than net profits, to calculate the loss from defendants' action. Specifically, defendants argue that the court failed to consider incremental costs that would have resulted from uninterrupted delivery to plaintiff (*e. g.*, finance costs, special order costs, costs of fittings) and fixed overhead (*e. g.*, rent, maintenance, electricity). However, there was abundant evidence in the record to support the conclusion that because plaintiff's operating expenses were largely unaffected by increases in watch sales, its gross profits on sales of the terminated product line would closely reflect its net profit. Credible evidence was offered to show that watch adjustments were made by the wholesaler at no expense, watch repairs after sale were few and inexpensive, additional sales personnel were unnecessary, advertising expenses were minimal, rental payments were not on a percentage basis, plaintiff pays no commissions to its salesmen, plaintiff does not sell on credit, and inventory payments are either delayed for months or tendered on consignment, thus reducing carrying costs. Where, as here, incremental operating expenses are nominal, gross profits on sales may be properly considered in assessing damages. *Locklin*, 429 F.2d at 882; *Distillers Distributing Corp. v. J. C. Millet Co.*, 310 F.2d 162, 164 (9th Cir. 1962); *Schatz v. Abbott Laboratories*, 51 Ill.2d 143, 281 N.E.2d 323, 326 (1972). The cases cited to the contrary by the defendants do not control for, unlike the one at bar, they involve significant incremental costs appurtenant to the increased volume of business. *Eastman Kodak*, 273 U.S. at 378–79, 47 S.Ct. at 405; *Wolfe*, 225 F.2d at 430; *L. P. Larson Co. v. William Wrigley Co.*, 20 F.2d 830, 832–36 (7th Cir. 1927), *rev'd on other grounds*, 277 U.S. 97, 48 S.Ct. 157, 72 L.Ed. 404 (1928).

In addition, we find nothing in the relevant precedent that compels a deduction of fixed overhead costs from the gross profits damage recovery in a lost inventory case; indeed, consideration of such fixed costs has been explicitly excluded from consideration in such cases. *See Todhunter–Mitchell*, 375 F.Supp. at 627.

Defendants finally assert that the projection of plaintiff's unit watch sales for 1978 and 1979, including a generous increase, are conjectural and did not consider the impact of increased intrabrand competition in plaintiff's vicinity. However, the record contained detailed evidence of plaintiff's and defendants' upward sales trends

in the disputed watch lines in previous years, and the spectacular scope and impact of defendants' then–recent advertising campaign. Judge Grady, after explicitly compensating for the effects of increased intrabrand competition, made what he stated to be conservatively biased calculations of the plaintiff's lost profits. We decline to label his findings "beyond the pale of sane judgment." *Locklin*, 429 F.2d at 880.

## III.

The appellants' third major target is the district court's injunction which prohibits the defendants from refusing to deal with plaintiff on the same terms (*e. g.*, price, service, availability, inclusion in advertising) available to other Chicago area retailers carrying the defendants' watch lines. It must be stated at the outset that the scope of the district court's injunction was initially unclear. Defendants argue that Judge Grady granted to Trabert & Hoeffer a "perpetual franchise" in defendants' watches which could not be terminated for any reason. Although the court did not specify in its decree conditions under which the injunction might be modified or lifted, Judge Grady noted at a post–trial hearing that the defendants would be allowed to seek modification of the decree for legitimate business reasons. We hereby modify the district court decree explicitly to allow defendants to petition for alteration of the injunction upon a showing of legitimate business reasons unrelated to a desire to restrain competition.

Defendants seek review of the decree even as modified. Their argument recites first that, absent a conspiratorial price–fixing motive, a defendant has a right to deal with whomever it pleases and therefore it was an abuse of the lower court's discretion to enjoin defendants from doing anything more than conspiring to fix prices. This argument skirts the fundamental logic and law of antitrust remedies.

It is settled that once a Sherman Act violation is proven, the district court has the duty to compel action by the conspirators that will, so far as practicable, cure the ill effects of the illegal conduct, and assure the public freedom from its continuance. Such action is not limited to prohibition of the proven means by which the evil was accomplished, but may range broadly through practices connected with acts actually found to be illegal. ... [R]elief to be effective must go beyond the narrow limits of the proven violation.

*United States v. Ward Baking Co.*, 376 U.S. 327, 330, 84 S.Ct. 763, 767, 11 L.Ed.2d 743 (1964) (quoting *United States v. United States Gypsum Co.*, 340 U.S. 76, 88–89, 90, 71 S.Ct. 160, 169, 170, 95 L.Ed. 89 (1950)). Where, as here, the court found that the defendants were furtive in their business conduct, evasive in their explanations, and were likely to terminate the plaintiff's supply after the instant suit in order to covertly achieve their unlawful purposes, it is especially appropriate to require the defendant to sell generally on a non–discriminatory basis in addition to enjoining the proven violations. *International Salt Co. v. United States*, 332 U.S. 392, 400, 68 S.Ct. 12, 17, 92 L.Ed. 20 (1947). "The District Court is not obliged to assume, contrary to common experience, that a violator of the antitrust laws will relinquish the fruits of his violation more completely than the court requires him to do." *Id.* The fact that the defendant's prerogative to select its customers "could be lawfully used does not mean that the defendants may leave the court unfettered. Civil suits under the Sherman Act would indeed be idle gestures if the injunction did not run against the continuance or resumption of the unlawful practice." *United States v. Crescent Amusement Co.*, 323 U.S. 173, 188, 65 S.Ct. 254, 261, 89 L.Ed. 160 (1944).

The issuance of an injunction against future refusals to deal with the injured company has been repeatedly upheld where necessary to cure past and to prevent future Sherman Act violations. *United States v. United Shoe Machinery Corp.*, 391 U.S. 244, 246, 88 S.Ct. 1496, 1498, 20 L.Ed.2d 562 (1968); *Lorain Journal Co. v. United States*, 342 U.S. 143, 72 S.Ct. 181, 96 L.Ed. 162

(1951); *International Salt*, 332 U.S. 392, 68 S.Ct. 12, 92 L.Ed. 20; *Todhunter–Mitchell*, 375 F.Supp. 610. Unlike *United States v. Bausch & Lomb*, 321 U.S. at 729, 64 S.Ct. at 816, cited by defendants, where the Court found unnecessary an injunction prohibiting a general refusal to deal with any customer able to pay since the Court did not doubt that the defendant would "conform meticulously to the requirements of the decree," the present case involves a much narrower remedy and an explicit finding that the defendants cannot be trusted to follow other portions of the decree without the injunctive remedy. Likewise, *FTC v. Beech–Nut Packing Co.*, 257 U.S. 441, 42 S.Ct. 150, 66 L.Ed. 307 (1922), is not contrary, for unlike here, the Court found that the Sherman Act violation was effectively curable by a mere prohibition of concerted action to enforce price schedules. Finally, the Court in *Lowe's, Inc. v. Milwaukee Towne Corp.*, 201 F.2d 19, 23 (7th Cir. 1952), *cert. denied*, 345 U.S. 951, 73 S.Ct. 650, 97 L.Ed. 1345 (1953), although reversing an injunction prohibiting refusals to deal, based its ruling on the finding that the injunction in fact gave plaintiff a "preferred status" over his competitors since the latter were still required to bid competitively for each movie lease while the plaintiff was not. Here, Trabert & Hoeffer has received no such preferred status; it has merely sought to do business with the defendants on the same terms as any other Chicago area franchisee.

We are further satisfied that the decree as modified works no inequity to the defendants, for it is "subject always to adaptation as events may shape the need," *United States v. Swift & Co.*, 286 U.S. 106, 114, 52 S.Ct. 460, 462, 76 L.Ed. 999 (1932), or as certain provisions become "inappropriate." *United States v. E. I. Du Pont De Nemours & Co.*, 366 U.S. 316, 323, 81 S.Ct. 1243, 1248, 6 L.Ed.2d 318 (1961). Although the defendants here complain of being saddled with an excessive burden of proof to overcome the decree, the Supreme Court has noted that in Sherman Act cases, the "usual ways to the prohibited goal may be blocked against the proven transgressor and the burden put upon him to bring any proper claims for relief to the court's attention." *International Salt*, 332 U.S. at 400, 68 S.Ct. at 17. In view of the evidence of defendants' evasive behavior and the now explicitly flexible nature of the decree, we do not find that the district court's issuance of the injunction constituted an abuse of discretion.

For the foregoing reasons, the judgment and decree of the district court is affirmed in part and modified in part. Each party shall bear its own costs.

AFFIRMED IN PART AND MODIFIED IN PART.