2004 UT App 227

**CARLSON DISTRIBUTING COMPANY, a Utah corporation, Plaintiff, Appellant and Cross-appellee,**

v.

**SALT LAKE BREWING CO., L.C., a Utah limited liability company; and Utah Brewers Cooperative, L.C., a Utah limited liability company, Defendants, Appellees, and Cross-appellants.**

No. 20030017–CA.

Court of Appeals of Utah.

July 1, 2004.

---

John P. Ashton, Thomas R. Barton, and James A. Boevers, Prince Yeates & Geldzahler, Salt Lake City, for Appellant.

Scott A. Call, Stephen P. Horvat, and Thomas R. Karrenberg, Anderson & Karrenberg, Salt Lake City, for Appellees.

Before Judges DAVIS, GREENWOOD, and THORNE, Jr.

## OPINION

THORNE, Jr., Judge:

¶ 1 Carlson Distributing Company (Carlson) and Salt Lake Brewing Co., L.C., (Salt Lake Brewing) both appeal in this matter arising from the termination of a beer distribution agreement. We affirm in part and reverse in part.

## BACKGROUND

¶ 2 Carlson and Salt Lake Brewing executed a distribution agreement on December 15, 1994, whereby Carlson agreed to distribute the Squatters brand of beer for Salt Lake Brewing. The agreement automatically renewed itself annually unless a party notified the other in writing of its election not to renew the agreement at least ninety days prior to the end of the term. If Salt Lake Brewing chose not to renew the agreement, it agreed to pay Carlson a "termination fee" of .75 times Carlson's gross profits derived from the sale of Squatters beer during the preceding twelve months. The agreement also provided that the termination fee was to be paid within thirty days after all obligations between the parties were settled.

¶ 3 On July 28, 2000, Salt Lake Brewing notified Carlson that it was terminating the distribution agreement, effective July 31, 2000. On August 4, 2000, Carlson filed suit alleging that Salt Lake Brewing had breach-

ed the distribution agreement by prematurely terminating the agreement and by raising the price of beer during the term of the agreement.[1] Carlson demanded lost profits for the five months remaining on the existing agreement, as well as the termination fee provided for in the distribution agreement. Later, Carlson amended its complaint and included a claim that Salt Lake Brewing had also violated the Utah Beer Industry Distribution Act (Beer Act). *See* Utah Code Ann. §§ 32A–11a–101 to –111 (2003).

¶ 4 Salt Lake Brewing counterclaimed and sought damages. It claimed that it had been justified in terminating the distribution agreement because Carlson had not used its "best efforts" in distributing the beer as required by the agreement. In the alternative, Salt Lake Brewing alleged that if it owed an early termination fee, the amount was $290,617.64 rather than the $351,842.00 alleged by Carlson. Furthermore, Salt Lake Brewing argued that Carlson owed it $12,992.74 in outstanding invoices, and that its obligation to pay the early termination fee was not triggered until Carlson paid this money. On January 25, 2001, Carlson deposited $12,992.74 with the court, designating it as "the amount due on its account with [Salt Lake Brewing.]"

¶ 5 On June 25, 2001, the parties signed a stipulation in which Salt Lake Brewing admitted that it had terminated the distribution agreement with Carlson without cause, that it had breached the agreement, and that "Carlson [was] entitled to a termination fee." However, Salt Lake Brewing "contend[ed] that a Judgment [on either the termination fee or any lost profits could] not be entered for a particular amount because discovery needs to be completed." Salt Lake Brewing also retained its right to pursue its counterclaim against Carlson.

¶ 6 Prior to trial, Salt Lake Brewing filed a motion in limine, seeking to exclude the testimony of Richard Carlson, president of Carlson, on the issue of lost profits over the unexpired term of the agreement. The basis for the motion was that the testimony spoke only to Carlson's lost *gross* profits and not the lost *net* profits allowed as damages by Utah law. The trial court denied Salt Lake Brewing's motion.

¶ 7 Also prior to trial, Carlson filed a motion to admit evidence concerning the performance of M & M Distributing Co., Carlson's successor as the distributor of Squatters beer. The trial court excluded the evidence pursuant to Utah Rules of Civil Procedure 402 and 403, finding that it was irrelevant to the question of Carlson's "best efforts," and that the probative value of the evidence was substantially outweighed by the potential for confusion and delay.

¶ 8 At the close of Carlson's evidence, Salt Lake Brewing moved for a directed verdict on Carlson's claim that Salt Lake Brewing had violated the Beer Act. The court granted the motion because the distribution agreement had been signed prior to the Beer Act's effective date. The court also granted Salt Lake Brewing's motion for directed verdict on the lost profits claim, finding that Carlson had not presented evidence of lost net profits as required by Utah law. All other issues were submitted to the jury.

¶ 9 After deliberation, the jury found that Salt Lake Brewing owed Carlson $294,022.56 as a termination fee. The jury also found that Salt Lake Brewing had not breached the distribution agreement by raising the price of Squatters beer, and that Carlson was therefore not owed any damages on that claim. In contrast, the jury found that Carlson had breached the distribution agreement by not using its best efforts in the sale, marketing, and distribution of Squatters beer and that Salt Lake Brewing had been damaged in the amount of $20,990.76 by that breach.

¶ 10 After trial, the court released the $12,992.74 Carlson had deposited with the

---

1. Carlson also alleged that Salt Lake Brewing had infringed upon its trademark rights under the distribution agreement. This claim was not pursued by Carlson and is not a subject of this appeal.

Carlson also sought injunctive relief, asking the court to reinstate the distribution agreement for the unexpired term. The trial court denied Carlson's request for a temporary restraining order, and Carlson does not argue that it is entitled to injunctive relief on appeal.

court to Salt Lake Brewing. Carlson then moved for prejudgment interest on the termination fee award and sought $145,000 in attorney fees and costs. Salt Lake Brewing also moved for $122,948.89 in attorney fees and costs. After conducting a hearing, the trial court determined that "neither party is a prevailing party" and denied both motions.

¶ 11 The trial court granted, in part, Carlson's request for prejudgment interest. The trial court concluded that Carlson had satisfied all of its obligations to Salt Lake Brewing on January 25, 2001 when it deposited the $12,992.74 it owed with the court. Accordingly, the court concluded that Salt Lake Brewing was obliged as of thirty days after that date to pay the termination fee. The court awarded Carlson $49,842.12 in prejudgment interest on the termination fee at a rate of 10% from February 24, 2001 through the date of the judgment. However, the court calculated the interest on the amount of $290,617.64, not the $294,022.56 awarded by the jury, because this was the amount "admitted to by [Salt Lake Brewing] in their Answer and Counterclaim."

¶ 12 Carlson and Salt Lake Brewing both appeal.

## ISSUES AND STANDARDS OF REVIEW

¶ 13 Carlson claims that the trial court erred when it granted Salt Lake Brewing's motion for directed verdict on its claim for lost profits. " 'A trial court is justified in granting a directed verdict only if, examining all evidence in a light most favorable to the non-moving party, there is no competent evidence that would support a verdict in the non-moving party's favor.' " *Five F, L.L.C. v. Heritage Sav. Bank,* 2003 UT App 373, ¶ 12, 81 P.3d 105 (quoting *Merino v. Albertsons, Inc.,* 1999 UT 14, ¶ 3, 975 P.2d 467). "We review a directed verdict under the same standard employed by the trial court." *Id.*

¶ 14 Carlson also claims that the trial court erred in excluding evidence regarding the effectiveness of the distributor that replaced it. " 'The trial court has broad discretion in determining the relevancy of offered evi-

dence, and error will be found only if the trial court abused its discretion.' " *Chapman v. Uintah County,* 2003 UT App 383, ¶ 7, 81 P.3d 761 (quoting *Larsen v. Johnson,* 958 P.2d 953, 956 (Utah Ct.App.1998)), *cert. denied,* 90 P.3d 1041 (Utah 2004).

▆▆ ¶ 15 Both parties raise claims that the trial court calculated prejudgment interest incorrectly. Carlson argues that the trial court awarded interest on an amount other than that determined by the jury. On cross-appeal, Salt Lake Brewing argues that the trial court erred in awarding Carlson prejudgment interest at all. " 'A trial court's decision to grant or deny prejudgment interest presents a question of law which we review for correctness.' " *Smith v. Fairfax Realty, Inc.,* 2003 UT 41, ¶ 16, 82 P.3d 1064 (quoting *Cornia v. Wilcox,* 898 P.2d 1379, 1387 (Utah 1995)) (other citation omitted), *cert. denied,* —— U.S. ——, 124 S.Ct. 1716, 158 L.Ed.2d 401 (2004).

▆▆ ¶ 16 Finally, both parties claim that the trial court abused its discretion when it refused to award attorney fees and costs. Carlson argues that it was the prevailing party in the suit as a whole and was entitled to a fee and cost award on that basis under the terms of the distribution agreement. In its cross-appeal, Salt Lake Brewing asserts that it was entitled to statutory attorney fees on Carlson's failed claim under the Beer Act. Whether a party is the prevailing party in an action is a decision left to the sound discretion of the trial court and reviewed for an abuse of discretion. *See R.T. Nielson, Co. v. Cook,* 2002 UT 11, ¶ 25, 40 P.3d 1119.[2]

## ANALYSIS

### A. Lost Profits

¶ 17 Carlson argues that the trial court erred when it granted Salt Lake Brewing's motion for directed verdict on the issue of lost profits. Carlson claims that its net profits were equal to its gross profits because its operating costs did not change when it stopped distributing Squatters beer. We agree with the trial court that Carlson only

---

**2.** Carlson also originally challenged the trial court's dismissal of its Beer Act claim, but has

since withdrawn this issue on appeal. Accordingly, we do not address it.

presented evidence of gross profits and that, under the circumstances of this case, such a showing was insufficient to permit Carlson's lost profits claim to reach the jury.

¶ 18 "A party is entitled to recover only lost net profits." *Sawyers v. FMA Leasing Co.*, 722 P.2d 773, 774 (Utah 1986). Recoverable net profits "are determined by computing the difference between the gross profits and the expenses that would be incurred in acquiring such profits." *Id.* "Therefore, proof of lost *gross* profits does not afford courts a proper basis for a damage award, where there is no evidentiary basis on which to calculate net profits with reasonable certainty." *Id.* (emphasis added). "In addition to proof of gross profits, there must generally be supporting evidence of overhead expenses, or other costs of producing income from which a net figure can be derived." *Id.*

¶ 19 Damages, to include lost profits, "must be proven with reasonable certainty and the amount by a reasonable though not necessarily precise estimate." *Id.* "The evidence must not be so indefinite as to allow the jury to speculate freely as to the amount of damages or lost profits," but "will be deemed sufficient to establish a basis for an award of damages for lost profits where the plaintiff has provided the best evidence available to him under the circumstances." *Penelko, Inc. v. John Price Assocs., Inc.*, 642 P.2d 1229, 1233 (Utah 1982). "While the evidence must not be so indefinite as to allow the jury to speculate as to their amount, some degree of uncertainty is tolerable." *Acculog, Inc. v. Peterson*, 692 P.2d 728, 732 (Utah 1984).

¶ 20 Richard Carlson first testified that all of Carlson's costs were fixed and that no reduction of those costs occurred when Carlson stopped distributing Squatters beer. Carlson's compensable lost net profit would therefore equal its lost gross profit, or the difference between the price paid for Squatters beer and the price for which it was sold. Upon cross-examination, however, Mr. Carlson acknowledged multiple categories of

costs that would have been incurred by Carlson had Salt Lake Brewing fulfilled the remainder of the contract. These costs were not insignificant, and included advertising, commissions, and fuel costs, as well as the ongoing expense of maintaining existing accounts and employing best efforts to develop new ones. Asked repeatedly what these costs were, Mr. Carlson testified either that he had not calculated these costs or that they did not exist because they would not actually be incurred given the termination of the parties' business relationship.

¶ 21 Neither of these explanations fulfills the *Sawyers* requirement that proof of lost profit must be proof of net profit; i.e., the estimate must include proof of the costs that would be incurred in producing the profit. *See Sawyers*, 722 P.2d at 774. This proof requirement would have little effect if it could be avoided merely by the failure to calculate the very evidence that one is required to provide. Similarly, the observation that the identified costs did not in fact arise due to Salt Lake Brewing's breach is meaningless when the entire premise of the lost profits analysis is that the contract—with its attendant income and costs alike—would have continued absent the breach.

¶ 22 Carlson argues that an opposite result is required under the logic of *Distillers Distributing Corp. v. J.C. Millett Co.*, 310 F.2d 162 (9th Cir.1962), which also involved the breach of a liquor distribution arrangement. We disagree. The holding of that case, as it relates to this one, is that "where the operating expenses are fixed, gross profits may be awarded as representing net profits." *Id.* at 164. This rule presupposes evidence that operating expenses are indeed fixed, while requiring deduction of those nonfixed expenses that can be identified.

¶ 23 In *Distillers Distributing Corp.*, the $14,288.00 of true gross profit alleged by the plaintiff was offset by $2,414.67 (over 15%) for discounts to purchasers, and $3,957.77 (over 25%) for commissions to salespersons.[3]

---

**3.** Carlson argues that it "paid the same amount of money to its employees for commission bonuses for the year 2000, as if Carlson had continued to distribute Squatters beer after July 31 of that

year." While admirable, such a gesture conflicts with Carlson's duty to mitigate its damages as regards Salt Lake Brewing's breach, and cannot

*Id.* at 163. In the present case, Carlson's evidence as a whole does not support the conclusion that all of its operating expenses were fixed. Nevertheless, Carlson made no attempt to quantify and deduct the sales commissions and other costs identified at trial.[4]

▮ ¶ 24 " 'A trial court is justified in granting a directed verdict only if, examining all evidence in a light most favorable to the non-moving party, there is no competent evidence that would support a verdict in the non-moving party's favor.' " *Five F, L.L.C. v. Heritage Sav. Bank,* 2003 UT App 373,¶ 12, 81 P.3d 105 (quoting *Merino v. Albertsons, Inc.,* 1999 UT 14,¶ 3, 975 P.2d 467). Here, Carlson presented evidence of its gross profit under the distribution agreement while acknowledging the existence of multiple costs that would have been incurred had the contract been completed. Having acknowledged the existence of these costs, Carlson provided no evidence from which the jury could reasonably determine the actual costs or Carlson's lost net profit. Under these circumstances, any verdict awarding Carlson lost profits would have been speculative and would not have been supported by the evidence. A directed verdict was the correct remedy.

## B. Evidence of New Distributor's Efforts

▮ ¶ 25 Carlson sought to introduce evidence that sales of Squatters beer decreased dramatically after Salt Lake Brewing terminated the distribution agreement and replaced Carlson with M & M Distributing Co. (M & M). The evidence was offered to defend against Salt Lake Brewing's counter-claim alleging Carlson's failure to use its "best efforts" to distribute Squatters beer under the distribution agreement. The trial court excluded the evidence, finding that it was irrelevant to the issue of Carlson's efforts to distribute Salt Lake Brewing's products, and that any probative value of the evidence was outweighed by its potential to confuse the jury and cause undue delay. We agree.

▮ ▮▮▮ ¶ 26 Relevant evidence is defined as "evidence having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." Utah R. Evid. 401. "Evidence which is not relevant is not admissible." Utah R. Evid. 402. " ' "We will find error in a relevancy ruling only if the trial court has abused its discretion. Additionally, an erroneous evidentiary ruling will lead to reversal only if, absent the error, there is a reasonable likelihood that there would have been a more favorable result. . . ." ' " *Chapman v. Uintah County,* 2003 UT App 383,-¶ 28, 81 P.3d 761 (quoting *Larsen v. Johnson,* 958 P.2d 953, 957 (Utah Ct.App.1998)) (other citations omitted).

¶ 27 Both parties cite *Bloor v. Falstaff Brewing Corp.,* 454 F.Supp. 258 (S.D.N.Y. 1978), *aff'd,* 601 F.2d 609 (2d Cir.1979), to support their arguments. Carlson argues that the phrase "best efforts" necessarily implicates the objective standard of the "average, prudent, [and] comparable" distributor, *id.* at 267, and that evidence of M & M's efforts as such a distributor is relevant to determining Carlson's objective performance. In contrast, Salt Lake Brewing argues that a

---

be used to justify Carlson's commission expenses as fixed when in fact they were not.

4. In *Distillers Distributing Corp. v. J.C. Millett Co.,* 310 F.2d 162 (9th Cir.1962), the plaintiff's evidence that its expenses were fixed and would not be reduced by the defendant's breach was uncontroverted. *Id.* at 164. Here, Carlson's evidence is contradictory in that nonfixed expenses are identified but dismissed without quantification or explanation as to why they should not be included in the net profit calculation. Such a showing is insufficient to allow the question of net profits to be put to the jury. *See, e.g., Sawyers v. FMA Leasing Co.,* 722 P.2d 773, 775 (Utah 1986) ("[Plaintiffs'] failure to place before the court financial summaries, monthly sales volume breakdowns, costs of sales expenses, or any other overhead expenses . . . is fatal to their claim."); *Penelko, Inc. v. John Price Assocs., Inc.,* 642 P.2d 1229, 1233 (Utah 1982) (finding sufficient evidence of net lost profits despite lack of deduction for labor and depreciation costs where family business did not pay wages and accountant based analysis solely on "cash receipts and disbursements"); *see also Trabert & Hoeffer, Inc. v. Piaget Watch Corp.,* 633 F.2d 477, 484 (7th Cir. 1980) (finding adequate explanations for nonexistence of alleged incremental operating expenses).

subjective standard is appropriate, citing the *Bloor* court's observation that "Falstaff did not contract to promote Ballantine at the level or to the degree that Anheuser–Busch or Schlitz might have done. It did, however, contract to merchandise Ballantine products in good faith and to the extent of its own total capabilities." *Id.*

¶ 28 We agree with Salt Lake Brewing's interpretation of *Bloor* that "best efforts" is primarily a subjective standard under which a party agrees to do the best that it can regardless of the capabilities of others. Under such a definition, evidence of the actions or capabilities of others may still be relevant. However, the two entities must indeed be comparable in the sense that evidence of the performance of the one must also be evidence of the capabilities of the other. In this case, the trial court specifically found that M & M's sales activities took place under "different conditions and circumstances" than Carlson's did.

¶ 29 The trial court did not exceed the bounds of its discretion in concluding that Carlson and M & M distributed Squatters beer under different conditions and circumstances. At a minimum, the record reflects that M & M was taking on Squatters as a new line, and one that was in direct competition with other brands that were already established in the M & M distribution scheme. The trial court did not exceed the limits of its discretion in concluding that, under these changed circumstances, M & M's performance was not relevant to the question of whether Carlson's efforts were its "best efforts."

¶ 30 We conclude that the "best efforts" standard is primarily a subjective one, relating in this case to the capabilities and circumstances of Carlson alone. In order to have relevance to the determination of Carlson's best efforts, the efforts of M & M (or any other distributor) would have to take place under similar circumstances where evidence of M & M's efforts would bear in some meaningful way on Carlson's capabilities to perform similarly. Here, the trial court found, and the record supports, changed circumstances such that M & M's actual performance did not accurately reflect upon whether Carlson employed its own best efforts. For these reasons, we conclude that the trial court did not exceed the limits of its discretion in excluding as irrelevant evidence of M & M's subsequent efforts to sell and distribute Squatters beer.

### C. Prejudgment Interest

¶ 31 Both parties object to the trial court's decision relating to prejudgment interest on the termination fee awarded to Carlson. "As established nearly a century ago ... Utah courts award prejudgment interest in cases where 'damages are complete' and can be measured by 'fixed rules of evidence and known standards of value.' " *Smith v. Fairfax Realty, Inc.,* 2003 UT 41, ¶ 17, 82 P.3d 1064 (citations omitted). We conclude that an award of prejudgment interest on the termination fee award was appropriate, but that interest should have been awarded on the amount determined by the jury rather than the amount that Salt Lake Brewing admitted to in its Answer and Counterclaim.

¶ 32 "Prejudgment interest is awarded 'to compensate a party for the depreciating value of the amount owed over time and, as a corollary, to deter parties from intentionally withholding an amount that is liquidated and owing.' " *Lefavi v. Bertoch,* 2000 UT App 5, ¶ 24, 994 P.2d 817 (citation and alterations omitted). Salt Lake Brewing contends that, under the distribution agreement, its termination fee to Carlson did not become due and owing until thirty days after Carlson paid all of its outstanding invoices. Salt Lake Brewing further argues that Carlson's payment of nearly $13,000 in outstanding invoices into the court in January 2001 did not constitute delivery of the funds to Salt Lake Brewing and, therefore, did not trigger the termination fee procedures.

¶ 33 The trial court found as matters of fact that Carlson deposited the invoice funds with the court on January 25, 2001; that Carlson argued in a contemporaneous Motion for Partial Summary Judgment that the deposit fulfilled its obligation to deliver the funds to Salt Lake Brewing under the distribution agreement; that Salt Lake

Brewing failed to dispute this assertion in its opposition to the motion; and that Salt Lake Brewing did not object to the deposit or request that the funds be released until July 31, 2002. As conclusions of law, the trial court ruled that this failure to object constituted a waiver of the agreement's delivery requirement, that the deposit triggered the termination fee, and that the termination fee became due and owing in February 2001.[5] We see no error in the trial court's factual or legal determinations in this regard.

■ ¶ 34 We do, however, hold that the trial court erred in awarding prejudgment interest on the $290,617.64 admitted as the proper amount of any termination fee in Salt Lake Brewing's Answer and Counterclaim, rather than the $294,022.56 actually awarded by the jury. The fee, as determined by the jury, was due and owing in February 2001, and Carlson had been deprived of the use of those funds since that time. As prejudgment interest is intended "to compensate a party for the depreciating value of the amount owed over time," *Lefavi*, 2000 UT App 5 at ¶ 24, 994 P.2d 817, the only appropriate amount upon which such interest can be awarded is the amount owed, i.e., the amount awarded by the jury.

¶ 35 For these reasons, we affirm the trial court's award of prejudgment interest, but reverse and remand to the trial court for calculation of such interest based on the $294,022.56 actually awarded by the jury.

#### D. Award of Attorney Fees and Costs to Prevailing Party

■ ¶ 36 Both parties appeal the trial court's decision that neither was the prevailing party entitled to attorney fees and costs. We affirm the trial court's decision.

■ ¶ 37 Whether or not a party is the prevailing party is a question for the trial court, depending in large measure on the context of each case. *See R.T. Nielson Co. v.*

---

5. The trial court order actually referred to February 2002, but it is clear from the context that the correct year was 2001.

6. "In Utah, attorney fees are awardable only if authorized by statute or contract." *R.T. Nielson Co. v. Cook*, 2002 UT 11, ¶ 17, 40 P.3d 1119

*Cook*, 2002 UT 11, ¶ 25, 40 P.3d 1119. Therefore, "it is appropriate to leave this determination to the sound discretion of the trial court." *Id.* Considerations for the trial court include, but are not limited to,

> (1) contractual language, (2) the number of claims, counterclaims, cross-claims, etc., brought by the parties, (3) the importance of the claims relative to each other and their significance in the context of the lawsuit considered as a whole, and (4) the dollar amounts attached to and awarded in connection with the various claims.

*Id.* While in most cases there can be only one prevailing party, the *R.T. Nielson Co.* standard "will permit a case-by-case evaluation by the trial court, and flexibility to handle circumstances where both, or neither, parties may be considered to have prevailed." *Id.*

■ ¶ 38 The trial court made its attorney fees determination pursuant to the parties' distribution agreement.[6] As an initial matter, the trial court concluded that Salt Lake Brewing was not entitled to fees and costs under the Beer Act because it had previously determined that the Act could not be applied retroactively to the facts of this case. The trial court then applied the *R.T. Nielson Co.* factors to the case as a whole and concluded that neither side had prevailed.

¶ 39 In making its determination, the trial court found the second and third *R.T. Nielson Co.* factors (the number of total claims, and the importance of claims relevant to each other and in context of the lawsuit as a whole) to be particularly applicable. The trial court determined that, of the multiple claims and counterclaims in the case, Carlson prevailed solely on the termination fee claim for a net judgment of $273,000. Salt Lake Brewing prevailed on every other claim in the case, including Carlson's request for injunctive relief and other claims for breach of contract, trademark violation, and violation of

---

(citations and quotations omitted). Here, the distribution agreement provided "[i]f any action is brought by either party in respect to its rights under this Agreement, the prevailing party shall be entitled to reasonable attorneys' fees and court costs as determined by the court."

the Beer Act, as well as Salt Lake Brewing's counterclaim for breach of contract. Examining the totality of the claims and results, the trial court concluded that Carlson "was unsuccessful on important and significant claims considering the context of the lawsuit as a whole" and that, notwithstanding the $273,000 net judgment in favor of Carlson, neither party was the prevailing party. The trial court also determined that, as a factual matter, both parties reasonably expended $115,000 on attorney fees attributable to the portions of the case upon which they prevailed.

¶ 40 We conclude that the trial court's analysis falls well within the discretion afforded to it. *R.T. Nielson Co.* expressly foresaw circumstances wherein "both, or neither, parties may be considered to have prevailed." 2002 UT 11 at ¶ 25, 40 P.3d 1119. The trial court addressed the *R.T. Nielson Co.* factors in detail and determined that neither party was the prevailing party. In these circumstances we will not substitute our judgment for that of the trial court.

¶ 41 We also affirm the trial court's determination that Salt Lake Brewing is not independently entitled to fees pursuant to the Beer Act, although on separate grounds than those relied on by the trial court.[7] Although the trial court found that the Beer Act's attorney fees provision could not apply to an agreement executed prior to the Beer Act's enactment, we conclude instead that the Beer Act claim was properly treated as merely one component of the action as a whole.

¶ 42 The trial court expressly considered Salt Lake Brewing's success on Carlson's Beer Act claim in making its determination that neither side was the prevailing party despite Carlson's significant net money judgment. Further, the court determined that, if it were to declare both sides the prevailing parties based on the claims that they did prevail on, they would each be entitled to offsetting fee awards of $115,000. The court expressly included Salt Lake Brewing's fees attributable to the Beer Act claim in making this determination.

¶ 43 The fee and cost provisions of both the parties' distribution agreement and the Beer Act are triggered by a party prevailing in an *action*, not necessarily on individual claims within that action. *See* Utah Code Ann. § 32A–11a–110(2)(a) (2003). The trial court expressly considered Salt Lake Brewing's successful defense of the Beer Act claim, and the fees incurred in mounting that defense, in rendering its decision that no party prevailed in the action as a whole. This result is not in conflict with Utah Code Annotated section 32A–11a–110(2)(a), and comports with the Utah Supreme Court's recognition in *R.T. Nielson Co.* that prevailing party determinations must take into account "the importance of the claims relative to each other and their significance in the context of the lawsuit considered as a whole." 2002 UT 11 at ¶ 25, 40 P.3d 1119.

¶ 44 We conclude that the trial court did not exceed the limits of its discretion in determining that no party prevailed in this action, and that Salt Lake Brewing is not statutorily entitled to fees or costs independent of that determination merely because it prevailed on Carlson's Beer Act claim. Accordingly, we affirm the trial court's decision not to award attorney fees or costs to either party in this matter.[8]

---

7. "It is well settled that an appellate court may affirm the judgment appealed from 'if it is sustainable on any legal ground or theory apparent on the record, even though such ground or theory differs from that stated by the trial court to be the basis of its ruling or action, and this is true even though such ground or theory is not urged or argued on appeal by appellee, was not raised in the lower court, and was not considered or passed on by the lower court.' "
*Bailey v. Bayles*, 2002 UT 58,¶ 10, 52 P.3d 1158 (citations omitted).
We note, however, that the trial court's decision that the Beer Act's attorney fees provision

could not be applied retroactively is called into significant question by the Utah Supreme Court's recent decision in *State v. One Lot of Personal Property*, 2004 UT 36, 90 P.3d 639 (awarding fees and costs in a forfeiture action where the forfeiture arose prior to the enactment of the attorney fee statute but the action was filed and the fees incurred after the statute took effect).

8. Carlson also requests attorney fees and costs on appeal as a prevailing party pursuant to the parties' distribution agreement. Because we affirm the trial court's determination that neither party prevailed in the action below, Carlson is

## CONCLUSION

¶ 45 We affirm the trial court's directed verdict on Carlson's lost profits claim; its exclusion of evidence pertaining to the post-breach performance of Carlson's successor; its decision to award prejudgment interest on Carlson's termination fee award; and its decision not to award attorney fees or costs to either party.  We find error in the trial court's failure to award prejudgment interest on the full amount of the termination award as determined by the jury, and remand that portion of this matter for proceedings consistent with this opinion.

¶ 46 WE CONCUR: JAMES Z. DAVIS and PAMELA T. GREENWOOD, Judges.

not entitled to fees and costs on appeal and its    request is denied.